**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SRINIVAS KONERU,<br><br>       Plaintiff,<br><br>   v.<br><br>SECURITIES & EXCHANGE COMMISSION,<br><br>      Defendant. | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This action against the Securities and Exchange Commission ("SEC") arises out of the SEC staff's blatant violations of the Anti-Deficiency Act, 31 U.S.C. §§ 1341 *et seq.*, during the recent government shutdown.  The staff has investigated Plaintiff Srinivas Koneru for nearly five years on shifting and incoherent theories of wrongdoing—all of which are meritless, but none of which is at issue in this action.  Despite having failed for years to uncover any iota of wrongdoing, the SEC staff in October 2025 continued to pursue its investigation in violation of the Anti-Deficiency Act, which narrowly circumscribes permissible agency actions during a lapse in congressional appropriations.  On November 7, 2025, before the shutdown ended, the staff filed a lawsuit against Mr. Koneru in the Southern District of New York (the "SDNY Action").[1]  The SEC staff's investigation and then pursuit of non-emergency litigation that did not relate to any imminent threat to persons or property during the lapse in congressional appropriations violated the Anti-Deficiency Act.  The same investigation and pursuit of non-emergency litigation during the lapse in appropriations also violated the SEC's own contingency plan published in August 2025.

2.      The plain language of the Anti-Deficiency Act is unambiguous:  the statute forbids any "officer or employee of the United States Government" from "employ[ing] personal services exceeding that authorized by law except for ***emergencies*** involving the safety of human life or the protection of property."  31 U.S.C. § 1342 (emphasis added).  An "emergency" means "an ***unforeseen*** combination of circumstances or the resulting state that calls for immediate action." *See Emergency*, Merriam-Webster.com Dictionary (2025) (emphasis added).  An emergency "does not include ongoing, regular functions of government."  31 U.S.C. § 1342.  Absent an emergency, the agency has no authority to act—period.

3.      The SEC staff's actions against Mr. Koneru were not justified by any emergency. The staff's activity during the shutdown was not a response to any imminent safety threat to human

---

[1] Complaint, *SEC v. Koneru*, No. 25-CV-09327-LJL (S.D.N.Y. Nov. 7, 2025) ("Complaint").

life or an effort to protect any existing property interest of the federal government from such a threat.  The SEC's Complaint in the SDNY Action relates to events that occurred five or more years ago.  And the SEC claims its theories are based on documents the SEC has had in its possession for all or most of that time.

4.      The SEC staff's allegations against Mr. Koneru also did not arise out of any exigency.  The staff's investigation began nearly *five years ago*, and the staff concluded the final witness interview *nine months ago*.  The SEC staff could have sought to bring an enforcement complaint long ago—so staff's failure to commence any proceeding before the widely anticipated government shutdown was the result of the SEC staff's own deliberate inaction over the past months and years, not a *bona fide* emergency.  The SEC staff's unlawful Complaint also does not seek emergency relief.  And because Triterras became a private company after the events at issue in the SEC's Complaint, there are no longer even any investors in a publicly traded Triterras, let alone investors facing harm or needing protection.  Moreover, Mr. Koneru is retired, living abroad, and holds no leadership role with any publicly traded company.  He presents no emergent threat to United States securities markets—much less to human life or property.  Put simply, the SEC staff cannot flout the shutdown to remedy a perceived crisis of its own making.

5.      The SEC staff's Anti-Deficiency Act violations were knowing and intentional, especially where the staff's actions *also* violated the SEC's own shutdown contingency plan.  The SEC was aware of its obligations under the Anti-Deficiency Act.  The agency disseminated a contingency plan to the staff, and that contingency plan acknowledged the strict government shutdown limitations set by Congress.  But certain SEC staff members investigating Mr. Koneru, several of whom were furloughed and so forbidden from working on investigations and routine litigation, continued expending agency resources despite both the Anti-Deficiency Act and the contingency plan.  With the shutdown looming, these staff members informed Mr. Koneru via a Wells notice that they would initiate an enforcement action on new issues not previously covered in the staff's investigation.  Then, after the shutdown began, they utilized government computers,

downloaded documents, prepared a complaint, denied Wells process entitlements to Mr. Koneru, persuaded the Commission to approve an enforcement action, and filed the enforcement action—all in defiance of an express statutory prohibition.

6.     The staff's violation of the Anti-Deficiency Act triggers a remedy under the Administrative Procedure Act ("APA").  The APA prohibits agency actions that are arbitrary, capricious, or "contrary to law," *see* 5 U.S.C. 551 *et seq.*, including agency actions that "fail[] to meet statutory, procedural, or constitutional requirements," *Abramowitz v. Lake*, --- F. Supp. 3d ---, 2025 WL 2480354, at *10 (D.D.C. Aug. 28, 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971)).  The staff's Anti-Deficiency Act violations, and in particular the staff's filing of a non-emergency lawsuit during the shutdown, all were "contrary to law" and are subject to judicial review under the APA.

7.     The staff's concocted "emergency" was the final, unlawful end to a long series of departures from other established norms governing the staff's conduct of investigations.   In derogation of standard SEC practice, the staff (i) refused defense counsel's numerous requests to present to the staff on any topic of concern; (ii) initiated a Wells process on charges it never had investigated in voluntary interviews and testimony; (iii) refused requests to meet with enforcement leadership; (iv) demanded that Mr. Koneru sign a ***backdated*** tolling agreement that purportedly would have resuscitated claims that by then, already were time-barred; and (v) filed a complaint premised on theories that it never investigated or presented fully and fairly to Mr. Koneru during the Wells call.  The staff's radical departures from typical practice are concerning in their own right, but these deviations also underscore the staff's cavalier approach toward Mr. Koneru, which culminated in the unlawful litigation filing on November 7, 2025.

8.     The staff continued a non-emergency investigation and initiated new non-emergency litigation during a lapse in appropriations, all of which was unlawful.  The Court should declare the SEC's actions to have been illegal, set aside the SEC's Complaint and enjoin the SEC from continuing the litigation.

## PARTIES AND JURISDICTION

9.     Plaintiff Srinivas Koneru is a 65-year-old U.S. citizen and well-respected entrepreneur residing in Dubai.  Mr. Koneru is the founder of Triterras, a financial-technology company that formerly traded on the Nasdaq stock exchange in New Jersey.[2]  In March 2025, Triterras became a privately held company owned by Mr. Koneru and other investors.

10.     Mr. Koneru founded Triterras to solve payment and risk problems that arise in commodities trading.  Physical commodities like palm oil, sugar, copper, steel, and wheat are a lifeblood of international trade, with hundreds of millions of tons shipped across the world's oceans each year.  But commodities pose unique challenges from a payments and risk perspective for buyers and sellers.  Commodities often must journey great distances and many months from points of export to their destinations.  Buyers prefer to pay for commodities only upon receipt. Sellers, by contrast, prefer to receive payment immediately, before shipping the commodity. Cross-border trading exacerbates these problems, as the trading parties may not know one another and have limited ways to enforce contracts and mitigate risks of default.  In addition, cross-border trading historically has been hampered by antiquated paper records, making it difficult to verify parties' trading histories and exacerbating fraud risks.

11.     Triterras developed an innovative marketplace—the Kratos platform—to help solve these problems by allowing parties to record "trade finance" transactions on a centralized system.  Although not itself a real-time trading platform, Kratos allowed parties to build a visible history of responsibly using trade finance when buying and selling physical commodities. Building this record of trust provided real value to participants on the Kratos platform, and in particular provided value to small and medium-sized enterprises ("SMEs"), which historically had struggled to access trade finance on terms comparable to those offered to their larger competitors.

---

[2] Nasdaq servers documenting trading activities are located in New Jersey.  *Cf.* Complaint ¶ 17 (improperly asserting jurisdiction based on Nasdaq's purported location in New York).

12. Triterras was acquired by Netfin, a special-purpose acquisition company, on November 10, 2020, and began publicly trading on that date. There never has been any dispute that Triterras was a real business with real customers on the Kratos platform. For the fiscal year ended February 28, 2021, Triterras reported revenue of $55.4 million and profit of $45.2 million.

13. To the extent any past investors in Triterras may have been harmed (which Mr. Koneru denies), those investors already were compensated. On December 21, 2020, investors filed a putative class action alleging purported securities violations in the period before and after the Netfin transaction. *See Ferraiori v. Triterras, Inc.*, No. 7:20-cv-10795, Compl., Dkt. No. 1 (S.D.N.Y. Dec. 21, 2020); *see also id.*, Am. Compl., Dkt. No. 38, at ¶ 16 (defining class period "from June 29, 2020 to January 14, 2021"). The plaintiffs made allegations on numerous topics, including those related to "the users of Fintech's trading platform" and "the state of the commodities trade financing industry." *Id.*, Settlement Agreement, Dkt. No. 57, at 2–3. The plaintiffs settled not only those claims, but also all other claims that "could have been asserted" related to "the purchase or acquisition of Class A common stock or warrants of Triterras during the Class Period." *See id.* at 9 (defining "Released Claims").

14. The district court overseeing the class-action litigation approved the settlement and agreed that it was "in all respects, fair, reasonable, and adequate and in the best interests of the class." *See id.*, Order Approving Settlement, Dkt. No. 76, at ¶ 7(a).

15. Triterras ceased operating as a public company and became a private entity on March 12, 2025. Mr. Koneru now is retired from public company work and no longer serves as an executive or director for any publicly traded company.

16. Defendant United States Securities & Exchange Commission is an executive agency headquartered in Washington, D.C. The SEC is responsible for the enforcement of the federal securities laws. The SEC's chairman and other commissioners are appointed by the President and constitute the "Commission." The Commission must authorize the filing of any enforcement action.

17.     This Court has personal jurisdiction over the SEC because the SEC resides in this judicial district.

18.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because all claims are based on federal law.

19.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because the SEC resides in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.     The Staff Commences an Investigation of Triterras.

20.     The SEC staff opened an investigation of Triterras in early 2021.  Over the next four years, the staff investigated numerous theories of wrongdoing—long before the staff's sudden efforts to file charges amidst a government shutdown.  Among other activities:

a.  From 2021 through 2023, the staff sent Triterras four sets of voluntary requests for document production.  Triterras responded to the document requests on a rolling basis beginning on May 18, 2021, and completed the last of its 40 rolling productions on August 29, 2023.  *See* Dec. of Neil J. Schumacher in Supp. of Compl. ("Schumacher Dec.") ¶ 2.

b.  In early 2024, the staff conducted voluntary interviews of Mr. Koneru and additional personnel at Triterras.

c.  On April 16 and May 10, 2024, counsel for Mr. Koneru sent the staff white papers addressing all of the allegations and theories of wrongdoing the staff had raised by those dates.  The staff never responded to these white papers.

d.  In May 2024, the staff subpoenaed Mr. Koneru and one other executive personally for testimony and for additional document productions.  As to Mr. Koneru, the staff's subpoena was highly unusual and contrary to established protocols for interacting with respondents cooperating with SEC investigations.  On May 28,

2024, the staff (although scheduled to speak with Mr. Koneru's counsel by telephone that same day), canceled that conference and then arranged for personal service of the subpoena on Mr. Koneru at John F. Kennedy International Airport while he was en route to his daughter's graduation.

e. On July 26, 2024, Mr. Koneru made his first production of documents responsive to the May 2024 subpoena.  Schumacher Dec. ¶ 3.

f. On December 11, 2024, Mr. Koneru sat for testimony in Dubai.  The subpoenaed testimony largely covered the same ground already covered in the voluntary interviews.

g. On February 25, 2025, the staff interviewed an additional Triterras executive.  This February 2025 interview was the last substantive interview the staff conducted in its investigation of Triterras.

h. On May 12, 2025 (over four months before the shutdown), Mr. Koneru completed a final production of documents responsive to the May 2024 subpoena. Schumacher Dec. ¶ 4.

21.    The staff's investigation did not cover the "trade finance" transactions recorded on the Kratos platform, which were the topic of the staff's complaint years later.  Instead, the staff focused its investigation on, for example, the accounting treatment of $10 million in unrelated fee revenue in August 2020, the activities of vendors that also were customers of Triterras, and Mr. Koneru's prior business associations.

22.    The staff repeatedly declined offers from defense counsel to meet to address whatever concerns the staff might have.  Typically, the staff agrees to meet with counsel for respondents to discuss the staff's primary concerns before initiating a Wells process (and certainly before recommending charges).  The staff here, however, refused no fewer than five offers to meet across the investigation's nearly half-decade duration.

23.     The staff's investigative activities and repeated refusals to discuss additional issues with counsel show that the staff's concerns regarding Mr. Koneru (meritless as they were) at minimum posed no "emergency."  The staff's litigation filing did not arise out of any emergent threat to securities markets—much less to life or property as required by the Anti-Deficiency Act. To the contrary, Mr. Koneru voluntarily complied with the staff's investigation and attempted to engage with the staff for years, during which the staff had ample time to investigate whatever concerns it could have had regarding Triterras.

**B.     The Staff Issues a Wells Notice Relating to Issues the Staff Never Investigated.**

24.     The staff added to its departures from typical agency practice on September 19, 2025, when—after over four years of investigation—the staff informed defense counsel that the staff would issue a "Wells" notice and initiate a Wells process against Mr. Koneru.

25.     The Wells process is an important step before charging an individual with securities violations.  In a typical Wells process, the staff and the respondent engage in a robust dialogue about the potential charges.  The SEC presents its theory of the case and supporting evidence, and the respondent receives a full and fair opportunity to correct any factual errors, provide additional evidence, and present legal arguments.  The staff then must evaluate the respondent's position and consider alternatives to litigation, such as a formal administrative procedure, settlement, or less severe charges.  This dialogue conserves agency resources and ensures that SEC staff does not recommend unmeritorious enforcement action to the Commission.  *See generally* Paul S. Atkins and Bradley J. Bondi, *Evaluating the Mission: A Critical Review of the History & Evolution of the SEC Enforcement Program*, 13 FORDHAM J. CORP. & FIN. L. 367, 379–80 (2008).

26.     The Wells process also provides safeguards for respondents.  The SEC Enforcement Manual (first published in 2008) states that the purpose of the Wells process is for the Commission "not only to be informed of the findings made by its staff but also, where practicable and appropriate, to have before it the position of persons under investigation at the time it is asked to consider enforcement action."  *See also* 17 C.F.R. § 202.5(c) (allowing respondents

to "submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation").

27.    As the SEC's Chairman Paul Atkins recently explained: "[T]he Wells process should be viewed as an extension of due process and fundamental constitutional rights that play an integral role in protecting citizens from a powerful government agency that could become policeman, prosecutor, judge, jury, and executioner all in one."  Keynote Address at the 25th Annual A.A. Sommer, Jr. Lecture on Corporate, Securities, and Financial Law (Oct. 7, 2025) (Ex. F) at 3.  "The SEC staff do not always get things right the first time, and the Wells process is a valuable procedural device that helps to guard against plain mistakes, extreme legal theories, misinformation, biases, and conflicts of interest."  *Id.*  "Providing the potential respondent or defendant with information about potential charges and the key evidence that forms the basis of those potential charges is critical to due process, fairness, and transparency."  *Id.* at 4.

28.    Chairman Atkins also has stated that the Wells process must provide respondents with reasonable time and opportunity to explain complex issues to the Commission and to meet with senior SEC staff:  "[T]he staff must also be realistic about time periods for submissions, especially in long, complicated cases.  Going forward, the staff will provide the other side with at least four weeks to make Wells submissions."  *Id.* at 5.  Also, "when requested in a timely manner, senior enforcement leadership will meet with defense counsel before making a recommendation to the Commission."  *Id.*

29.    The SEC staff here departed from these procedures in an increasingly arbitrary and ultimately unlawful pursuit of Mr. Koneru.  During and after the Wells call, the staff identified securities disclosures and email correspondence that purported to support the staff's allegations. Mr. Koneru had produced most of those documents on April 15 and 29, 2022, June 17, 2022, May 19, 2023, and June 30, 2023 (*see* Schumacher Dec. ¶ 4)—years before his testimony on December 11, 2024—yet the staff never asked Mr. Koneru or any other witness from Triterras about any of these securities disclosures or emails during voluntary interviews or testimony (*see*

Ex. C at App. B).  The staff's determination to begin a Wells process based on theories never pursued or addressed with the respondent during the investigation was highly unusual.

30.      The staff thereafter disregarded additional procedural norms in pursuit of Mr. Koneru.  The staff at first refused counsel's request to meet with the Director of Enforcement, another departure from typical Wells process.  *See* Schumacher Dec. ¶ 8 & Ex. A at 4, 5.  On September 29, 2025, the staff offered a meeting with lower-level officials, but only on the condition that Mr. Koneru sign a tolling agreement that would suspend the statute of limitations from running beginning September 30, 2025.  Weeks later, on October 16, 2025, the staff pressed Mr. Koneru to sign the same tolling agreement, which by then had backdated effect and purportedly would have resuscitated allegations that already were time-barred.  *See* Schumacher Dec. ¶ 8 & Ex. E at 5.  The staff again offered a meeting with the same lower-level officials, but not the Director of Enforcement.  *See id.*

31.      Counsel questioned the staff's insistence on conditioning meetings with SEC leadership on a tolling agreement, especially a tolling agreement backdated to weeks earlier.  On October 28, 2025, counsel stated: "A tolling agreement for an investigation that has dragged on for nearly five years involving conduct from over five years ago—much of which *already is time-barred*—never should be a condition to providing appropriate due process.  Indeed, requiring the relinquishment of a substantive right in exchange for a typical due process safeguard is the antithesis of due process.  The SEC Staff never should force a respondent to surrender substantive rights to engage in the *normal* robust pre-charging dialogue contemplated by the Wells process . . . ."  Ex. E at 1.  The SEC staff never replied to the October 28, 2025 email or proposed a normal tolling agreement with effect as of the signature date.  Counsel also never refused to sign a tolling agreement (to the contrary, Mr. Koneru was willing to sign a standard tolling agreement, without backdating).  *See id.*

32.    In a further departure from the Wells process, the SEC staff never provided a settlement proposal or even approached counsel to discuss possible resolution or settlement before initiating the SDNY Action.  *See* Schumacher Dec. ¶ 7.

33.    Finally, the SEC failed to recuse biased staff members from further participation in the investigation and Wells process.  In a letter to the Commission dated May 23, 2025 (and also shared with the SEC staff), counsel for Mr. Koneru highlighted the SEC staff's prolonged investigation without reasonable basis, lack of engagement with counsel, and waste of resources (*e.g.*, duplicative testimony with five attorneys in attendance).  The letter also called attention to the staff's apparent pursuit of supposed technical violations and other conduct not involving scienter.  The SEC staff ignored the letter and shortly thereafter filed charges against Mr. Koneru. The timing of these charges in relation to counsel's letter to the Commission raises the concerning possibility that the staff brought these charges in retaliation for raising concerns about the staff's conduct, not because the charges truly were appropriate.

34.    The SEC staff's deviations from typical investigative and Wells practices betrayed a disregard for processes that long have ensured fairness and transparency for the SEC and respondents alike.

35.    The SEC staff's pursuit of Mr. Koneru also deviates from this Administration's enforcement priorities.  The Administration has cautioned against enforcement where the alleged wrongdoer had no ill intent.  *See* Executive Order No. 14294 ("Fighting Overcriminalization in Federal Regulations"); Executive Order No. 14192 ("Unleashing Prosperity Through Deregulation").  Contrary to the directive to prioritize "matters where a putative defendant is alleged to have known his conduct was unlawful," *see* Executive Order No. 14294, the SEC staff failed to identify evidence of scienter and refused to consider settlement or alternative outcomes for this investigation.  The continued pursuit of Mr. Koneru also flouts the Administration's embrace of blockchain-based technologies—exactly the innovation that the Kratos platform used to provide digital and secure transaction recording and storage.

36.     Unfortunately, the staff's cavalier approach to Mr. Koneru culminated not only in departures from established norms, Chairman Atkins's stated policy goals, and the President's executive orders (all non-negotiable requirements in their own right), but also in blatantly unlawful acts—this time in the form of violations of the Anti-Deficiency Act.

**E.     The Staff Repeatedly Violates the Anti-Deficiency Act and the SEC Contingency Plan by Continuing Its Investigation of Mr. Koneru.**

37.     On October 1, 2025, the SEC's appropriations lapsed, and a government shutdown began.  The shutdown would last for 43 days until congressional funding was restored and the SEC and other government agencies resumed normal operations on November 12, 2025.

38.     Over the next several weeks, the SEC staff repeatedly violated the Anti-Deficiency Act, which sharply limits what actions federal agencies can take absent ongoing appropriations.  The SEC staff (including furloughed employees) advanced a non-emergency investigation by using government computers for routine correspondence, downloading and reviewing documents, engaging in internal discussions, and presenting to the Commission to recommend charges against Mr. Koneru.

**1.     The Investigation Was Not an "Emergency" Under the Anti-Deficiency Act.**

39.     The lapse in appropriations required that the SEC cease most operations in order to comply with the Anti-Deficiency Act.  That statute prohibits all agency action except "emergencies involving the safety of human life or the protection of property."  31 U.S.C. § 1342.

40.     The "emergency" exception to the Anti-Deficiency Act is narrow and did not justify work on Mr. Koneru's case during the shutdown.  An "emergency" in common parlance means an "an unforeseen combination of circumstances or the resulting state that calls for immediate action." *Emergency*, MERRIAM-WEBSTER.COM DICTIONARY;[3] *see also* Schumacher Dec. ¶ 8 & Ex. G at 3, *Emergency*, Webster's New Collegiate Dictionary, G. & C. MERRIAM & CO. (8th ed. 1981) (same); *id.* at 6, *Emergency*, American Heritage Dictionary, HOUGHTON MIFFLIN CO. (2d Coll. ed. 1982)

---

[3] https://www.merriam-webster.com/dictionary/emergency.

("An unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate action."); *id.* at 8, *Emergency* (4.a.i), Oxford English Dictionary, OXFORD UNIV. PRESS (Dec. 2024) ("A juncture that arises or 'turns up'; *esp.* a state of things unexpectedly arising, and urgently demanding immediate action.").  Black's Law Dictionary agrees:  an "emergency" is "a sudden and serious event or an unforeseen change in circumstances that calls for immediate action."  *See Emergency*, BLACK'S LAW DICTIONARY (12th ed. 2024).    Common to all these definitions are requirements that the emergency be ***urgent*** and arise from circumstances that are ***sudden*** or ***unforeseen***.

41.    The "emergency" exception thus does not authorize the continuation of routine investigations or other ongoing, regular functions of government.  *See* 31 U.S.C. § 1342 ("As used in this section, the term 'emergencies involving the safety of human life or the protection of property' does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property.").

42.    The President's guidance to the executive branch shortly after the government shutdown effectuated this statutory command and circumscribes the emergency exception accordingly.   The Administration explained that the Anti-Deficiency Act requires: "(a) a ***reasonable and articulable connection*** between the obligation and the safety of life or the protection of property; and (b) some ***reasonable likelihood*** that either the safety of life or the protection of property would be compromised ***in some significant degree*** by failure to carry out the function in question -- and that the threat to life or property can be reasonably said to be ***near at hand*** and ***demanding of an immediate response***."[4]

43.    Together with the statutory language that an emergency must "involv[e] the safety of human life or the protection of property," the plain meaning of § 1342 requires, at a minimum, the following:  (i) an imminent threat to life or property that is (ii) urgent and (iii) unforeseeable

---

[4] *Frequently Asked Questions During a Lapse in Appropriations* (Oct. 3, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/09/Frequently-Asked-Questions-During-a-Lapse-in-Appropriations.pdf (emphasis added).

or sudden, such that (iv) work during a lapse in appropriations truly is necessary to protect a significant threat to life or property. In other words, the purported "emergency" may not pose a merely theoretical or immaterial threat and may not arise from an agency's own inaction or failure to prepare for circumstances that were foreseeable advance.

44.    The staff's investigation of Mr. Koneru does not satisfy any of the requirements of an "emergency involving the safety of human life or the protection of property." 31 U.S.C. § 1342. ***First***, there is no threat (let alone an imminent one) to "human life" or even "protection of property" whatsoever. Mr. Koneru is retired. There are no investors being threatened—Triterras no longer is a public company. No "property" could be under threat, particularly where there is no ongoing public company whose property (or whose investors' property) could need protecting. And investors already years earlier had been compensated via a class-action settlement which (although neither Triterras nor Mr. Koneru admitted wrongdoing) a court determined was "fair, reasonable, and adequate" to make them whole. *See supra* ¶ 14.

45.    ***Second***, any such threat—even if it did exist—was not "urgent." The staff's investigation had plodded along for nearly five years. The SEC staff had received Triterras's first production of documents on May 18, 2021, and the last of its 40 productions of documents on August 29, 2023. *See* Schumacher Dec. ¶ 2. Documents that eventually would be cited in the staff's complaint against Mr. Koneru were produced on April 15 and 29, 2022, June 17, 2022, May 19, 2023, and June 30, 2023. *See id.* ¶ 4. The staff received testimony from Mr. Koneru over nine months earlier. No new allegations or evidence suddenly or unexpectedly came to light.

46.    ***Third***, even if the shutdown somehow posed an "urgent" threat to life or property, that urgency was not due to sudden ***unforeseeable*** circumstances, but instead was created only by the staff's lengthy periods of inaction. The staff, again, could have advanced its protracted investigation far more quickly. It is axiomatic that a situation the SEC itself creates cannot constitute an emergency. *See, e.g.*, *Wash. Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016) ("[T]ruly exceptional emergency situations . . . cannot

arise as a result of the agency's own delay.") (citing *Envtl. Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920–21 (D.C. Cir. 1983)). Any exigency created by the SEC's own doing is not a real "emergency."

47.     ***Finally***, confirming that there was no sudden or unforeseeable change in circumstances, the lapse in appropriations itself was ***not*** unforeseeable. To the contrary, the increasingly likely possibility of a lapse in appropriations was known for ***months*** before appropriations actually lapsed. The shutdown could not have taken the SEC by surprise. The possibility of a shutdown was reported widely by July 2025, more than two months before appropriations lapsed.[5] Coverage of an increasingly likely lapse in appropriations became ubiquitous by early September.[6] To the extent the staff needed to conclude its investigation and bring charges to avoid any perceived, imminent threats to life or property, the staff had ample time—but the staff did not do so.

48.     The staff nevertheless took numerous actions during the government shutdown to further its investigation and ultimate pursuit of Mr. Koneru. Each of the following activities during the shutdown violated the Anti-Deficiency Act:

49.     ***First***, the staff engaged in routine, non-emergency correspondence which required the use of government resources including computers and email servers. Specifically, on October 16, 2025, Associate Regional Director of the SEC's Enforcement Division Sheldon Pollock emailed defense counsel inquiring whether Mr. Koneru would sign the previously proposed tolling

---

[5] *See, e.g.*, J. Scholtes, et al., *Democrats seek shutdown strategy as White House plots to strip their power*, POLITICO (July 21, 2025), https://www.politico.com/news/2025/07/21/democrats-wrestle-with-shutdown-strategy-00464233; D. Morgan, *Partisan rancor in Congress raises risk of US government shutdown this fall*, REUTERS (July 31, 2025), https://www.reuters.com/world/us/partisan-rancor-congress-raises-risk-us-government-shutdown-this-fall-2025-07-31/.

[6] *See, e.g.*, B. Sprunt, *Tick tock: Congress has 14 legislative days to stop a government shutdown*, NPR NEWS (Sept. 2, 2025), https://www.vpm.org/npr-news/npr-news/2025-09-02/tick-tock-congress-has-14-legislative-days-to-stop-a-government-shutdown; E. Doherty, *Congress races to avoid government shutdown as partisan standoff deepens*, CNBC (Sept. 3, 2025), https://www.msn.com/en-us/news/politics/congress-races-to-avoid-government-shutdown-as-partisan-standoff-deepens/ar-AA1LOUZm (reporting that "the threat of a shutdown at the end of the month" had, by this point, "intensified").

agreement that would have allowed the SEC to seek civil penalties for statements by then beyond the statute of limitations.  *See* Ex. E at 5.

50.     Pollock stated that the SEC would accept a Wells submission "any day next week"—*i.e.*, no later than October 24, 2025, just four weeks after the Wells call, at a time when the SEC staff knew that the shutdown would continue for the foreseeable future.  *Id.*  Pollock also ignored counsel's prior request to meet with the Director of Enforcement but pressed defense counsel to meet with subordinates of the Director during the week of October 27—even though the staff could not complete any meaningful review of Mr. Koneru's 40-page evidentiary submission with over 130 footnotes and 60 exhibits and an independent expert report before October 27 without violating the Anti-Deficiency Act.  *Id.*; *see also* Ex. C (Wells submission for Mr. Koneru).  On October 20, 2025, pressed further about the SEC's legal authority to review the Wells submission and attempt to schedule meetings during the government shutdown, Pollock ignored the issue and instead reiterated that the SEC would not provide any further extension of the deadline despite the government shutdown.  *See* Ex. E at 4.

51.     On October 22, 2025, counsel for Mr. Koneru raised the staff's apparent violations of the Anti-Deficiency Act to Antonia Apps, Deputy Director of the Division of Enforcement for the Northeast Region.  Ex. E at 3–4.  Counsel described the administrative, non-emergency character of the staff's communications.  *See id.*  Counsel expressly requested a basis for the SEC's authority to continue a non-emergency investigation.  *See id.* ("Did the Staff obtain a legal opinion authorizing these actions, and if so, who provided it and on what basis?").  Apps never responded to the October 22, 2025 email.

52.     On October 27, 2025, Sam Waldon, Chief Counsel for the Division of Enforcement, similarly violated the Anti-Deficiency Act by engaging in correspondence regarding the SEC's investigation of Mr. Koneru.  *See* Ex. E at 2.  In a *volte-face*, Waldon stated that the Director of Enforcement now suddenly was "happy" to meet with counsel for Mr. Koneru—with no apparent regard for the Director's previous denials of interest in any such meeting.  *See id.*  The next day,

counsel for Mr. Koneru replied that he was "look[ing] forward to meeting with Director Ryan," but no such meeting ever took place. *See id.* at 1. Instead of scheduling the meeting with the Director, the SEC filed its Complaint.

53. **Second**, the staff engaged in routine, non-emergency investigative work by reviewing Mr. Koneru's Wells submission and exhibits. On October 24, 2025 (the date the SEC staff had demanded), counsel for Mr. Koneru lodged a Wells submission responding to the staff's allegations and requesting oral argument before the Commission. Counsel to Mr. Koneru planned to present exculpatory evidence to disprove the staff's allegations of wrongdoing once the SEC was permitted (by a resumption of appropriations) to consider that evidence. The Wells submission is attached as Exhibit C. *See* Schumacher Dec. ¶ 9.

54. On October 25, 2025, Kevin Osowski—a furloughed employee and one of the many SEC staff members investigating Mr. Koneru—violated the Anti-Deficiency Act by reviewing correspondence and downloading the exhibits to Mr. Koneru's Wells submission. Download receipts confirming Osowski's violation of the Anti-Deficiency Act are attached as Exhibit D. *See* Schumacher Dec. ¶ 10.

55. In the October 27, 2025 email to defense counsel, Waldon stated that he also had reviewed the Wells submission for Mr. Koneru. *See* Ex. E at 2. Those actions violated the Anti-Deficiency Act.

56. **Third**, Waldon and the Director of Enforcement—and based on information and belief, other staff members—engaged in internal discussions about the matter. *See id.* (confirming that Waldon discussed the Wells submission with the Director of Enforcement). Those actions violated the Anti-Deficiency Act.

57. **Fourth**, the staff presented its investigation to the Commission. The Commission generally does not authorize the filing of a lawsuit against a respondent without a presentation and action memorandum from the staff, all of which would have been created in violation of the Anti-Deficiency Act. The staff filed its lawsuit on November 7, 2025, and so, therefore, the staff must

have presented its investigation and action memorandum to the Commission at some point between October 24, 2025, and that date. Again, this presentation related to a routine, non-emergency investigation, violating the Anti-Deficiency Act.

*        *        *

58.    All of the above actions violated the Anti-Deficiency Act because none of them was justified by any "emergency" or imminent threat to life or property.

59.    Pausing the staff's investigation during the shutdown, as required by the Anti-Deficiency Act, would not have posed any threat to life or property—much less an imminent threat. Among other facts: (i) Triterras, by the time of the government shutdown, was no longer a publicly traded company, with the result that (ii) there were no current public Triterras investors who could have needed the SEC's immediate protection; (iii) Triterras investors already were redressed by a class-action settlement a district court had found "fair and reasonable"; (iv) Mr. Koneru had by that time retired; (v) Mr. Koneru no longer served as an executive or board member of any public company; and (vi) the staff had investigated Mr. Koneru for years in a meandering process plagued by the staff's own delays, confirming that nothing about Mr. Koneru or Triterras posed an "emergency" threat.

60.    Defense counsel made one final attempt to convey concerns regarding the Anti-Deficiency Act to the SEC. In a lengthy email to Waldon on October 28, 2025, counsel reiterated that the staff's continued investigation of Mr. Koneru presented no emergency "particularly where this matter involves a retired executive and Triterras is now a private company under different ownership." *See* Ex. E at 1. Counsel also inquired for a second time whether the SEC had received a legal opinion authorizing the staff's actions during the government shutdown. *See id.* Counsel also summarized the staff's refusal to provide a meaningful Wells process. *See id.* Waldon never responded to the October 28, 2025 email.

**2.      The Investigation Violated the SEC's Own Contingency Plan.**

61.      The same actions violated the SEC's own *Operations Plan Under a Lapse in Appropriations and Government Shutdown* (the "Contingency Plan"), which was published in August 2025 and prescribes (for internal purposes) what actions SEC employees may take during a government shutdown under the Anti-Deficiency Act.[7]   The Contingency Plan is attached as Exhibit B.

62.      The Contingency Plan required staff to "[w]ork with your supervisor to determine which meetings, hearings, testimony, depositions, etc., must be cancelled and make the required cancellations and/or postponements" and "[c]reate an extended voice mail message and set Microsoft Outlook status to 'out of office'" according to a suggested template.  Ex. B. at 11.

63.      The Contingency Plan states: "The SEC will not engage in . . . investigative work, including commencing investigations and conducting investigative testimony, except as necessary for the protection of property . . . ."  *Id.* at 16.

64.      The Contingency Plan also states: "A limited number of staff will be on duty to: [h]andle emergency enforcement matters, including temporary restraining orders and/or investigative steps necessary to protect public and private property; . . . [h]andle ongoing litigation that cannot be deferred because there is a threat to property . . . ."  *Id.* at 14.

65.      Here, as described further above, the staff (i) refused to extend deadlines upon shutdown, in stark contrast to the practice of other agencies, which immediately and proactively offered to extend all investigative deadlines for the duration of the shutdown; (ii) continued its investigation of Mr. Koneru by seeking and reviewing his response to the Wells submission; (iii) engaged in routine correspondence and internal conferences regarding the investigation; and (iv) presented to the Commission to seek authority to initiate new litigation—all of which was in furtherance of a non-emergency investigation.

---

[7] *See* Contingency Plan, SECS. & EXCH. COMM'N (Aug. 7, 2025), https://www.sec.gov/sec-plan-operations-during-lapse-appropriations.pdf.

66.    The Commission, too, lacked authority to authorize the illegal actions of the SEC staff.  Guidance from the Office of Personnel Management confirms that the Anti-Deficiency Act permits only emergency work—regardless of the furloughed or non-furloughed status of the employee.  *See Guidance for Shutdown Furloughs*, OFFICE OF PERSONNEL MANAGEMENT (Sept. 2025), at 2 ("[T]he term "excepted" is used broadly to refer to employees whose work is funded through annual appropriations but who are not furloughed because they are performing tasks that, by law, are allowed to continue during a lapse in appropriations.  Those tasks are referred to as "excepted work." . . . An employee may be required to perform excepted work activities during part of a lapse period and furloughed for the rest of the time.").[8]  The SEC's Contingency Plan similarly authorizes employees to work based on the nature of the matter, not based on the furloughed or non-furloughed status of the employee.  *See* Ex. B at 14 (authorizing work on "emergency enforcement matters" and "ongoing litigation that cannot be deferred").

**G.    The Staff Unlawfully Initiates Litigation During a Lapse in Appropriations.**

67.    The staff again violated the Anti-Deficiency Act on November 7, 2025, when it filed the Complaint against Mr. Koneru in the Southern District of New York.

68.    The signature block on lawsuit listed SEC staff members Pollock, David Stoelting, Wendy Tepperman, Amy Mayer, and Kevin Osowski.  Attorneys listed on a complaint are obligated to have read the complaint or to have authorized the filing of the Complaint.  Several of these staff members, including Mayer and Osowski, were furloughed at the time of the Complaint.

69.    The SDNY Action was a new matter.  There was no active, ongoing litigation or existing, court-established deadline that required the staff to act.

70.    The SDNY Action confirms that the staff's investigation of Mr. Koneru during the government shutdown was not justified by any emergent threat to life or property.  The SDNY Action alleges years-old conduct purportedly occurring before and around the time Triterras

---

[8] https://www.opm.gov/policy-data-oversight/pay-leave/reference-materials/guidance-for-shutdown-furloughs-sep-28-2025/?.

became a public company.  Among other allegations, the Complaint alleges that Mr. Koneru misrepresented the type of "trade finance" activity occurring on Triterras's Kratos platform, claiming that Mr. Koneru, *e.g.*, participated in purportedly misleading investor presentations on July 29, August 20, and October 1, 2020, *see* Complaint ¶¶ 63, 75–94; approved a proxy statement dated October 29, 2020, *id.* ¶¶ 49, 95–96; signed a Form 6-K filed on December 28, 2020, *id.* ¶ 160; and signed a Form 20-F for the fiscal year ended February 28, 2021, which was filed on March 7, 2022, *id.* ¶ 167.  Each of these presentations and securities filings was publicly available to investors and had been in the SEC's possession since shortly after the presentation or filing.

71.     Mr. Koneru denies the allegations in the SDNY Action, which misapprehend Triterras's business and custom and practice in the trade-finance industry.  *See* Ex. C & App. A (Wells submission and attached report from industry expert).  As relevant here, however, none of these allegations shows an emergent threat to life or property that somehow could justify a routine litigation filing in November 2025 in the midst of the government shutdown.

72.     The SEC staff never asked Mr. Koneru about the subject matter of the SDNY Action during either his voluntary interview in 2024 or his subpoenaed testimony that same year, even though short-seller reports in 2020 and 2021 and documents produced by Triterras in 2022 and 2023 related to the same topics.  The SEC staff never asked other Triterras witnesses about the subject matter of the SDNY Action either.  *See* Ex. C at App. B (appendix to Wells submission confirming that the SEC never asked Triterras witnesses about the documents the staff relied upon in its Wells call).  The SEC staff's allegations regarding trade finance are unrelated to the matters the staff investigated for several years (the proper accounting treatment of $10 million in fee revenue collected in July and August 2020; Triterras's relationships with customers that were also vendors; and Mr. Koneru's prior business associations).

73.     The SDNY Action does not request emergency relief.  The SDNY Action seeks only a permanent injunction against future violations of securities laws (as is standard in enforcement cases), not a temporary restraining order or preliminary injunctive relief that would

indicate suspected dissipation of assets or other ongoing, imminent harm.  *Cf. SEC v. MCC Int'l Corp.*, No. 2:22-CV-14129, 2022 WL 2760279, at *2 (S.D. Fla. May 18, 2022) (seeking emergency relief because defendant began to liquidate assets after receiving SEC subpoena), *aff'd*, 2024 WL 1508281 (11th Cir. Apr. 8, 2024).

74.    The statute of limitations also cannot have provided the "emergency" necessary to justify this extraordinary filing.  Under 28 U.S.C. § 2462 and 15 U.S.C. § 78u(d)(8)(A)(i), the SEC must commence any action for civil penalties or disgorgement (for violations not requiring scienter) within five years.  But by the time the SDNY Action was filed on November 7, 2025, claims based on numerous allegations in the complaint already had become untimely on July 29, August 20, and October 1, 2025.  *See* SDNY Compl. ¶ 63 (referring to investor presentations and other public statements on July 29, August 20, and October 1, 2020).  The SEC knew about the facts underlying its allegations for years and could have brought enforcement proceedings long before the lapse of congressional appropriations but instead concocted a supposed "emergency" to proceed during the shutdown.  For example:

a.    The SEC staff did not mention any forthcoming date or deadline in November 2025—either during the Wells call or the correspondence during the shutdown— that could explain the staff's perceived urgency.  Schumacher Dec. ¶ 5.

b.    The statute of limitations did not extinguish any claims considering the entire subject matter of the SDNY Action.  The Complaint alleges two events in November 2020: (i) the closing of the business combination on November 10, 2020, and (ii) the commencement of trading of Triterras shares on Nasdaq on November 11, 2020.  *See* SDNY Compl. ¶ 8.  Any claims accruing on those dates and subject to a five-year statute of limitations would have become untimely on November 10 and 11, 2025.  *See* 28 U.S.C. § 2462 and 15 U.S.C. § 78u(d)(8)(A)(i).  But the Complaint alleges many other, later events for which the statute of limitations has

not lapsed.  *See* SDNY Compl. ¶¶ 156–73 (alleging misstatements in December 2020 and March 2022).

c.  Further, any limitations period that may have begun to run on November 10 and 11, 2020, applies only to civil penalties and disgorgement (for violations not requiring scienter).  Claims for disgorgement (based on violations requiring scienter) and claims for equitable remedies, as the SEC seeks in the SDNY Action, survive.  *See* 15 U.S.C. § 78u(d)(8) (providing ten-year limitations period for disgorgement based on claims requiring scienter and any equitable remedies); SDNY Compl. at 45 (requesting disgorgement for several alleged violations requiring scienter and equitable remedies).

75.  More importantly, statutes of limitations are irrelevant to whether an "emergency" existed.  The expiration of a statute of limitations at best means the staff would face the potential loss of some remedies arising out of certain alleged events that occurred in November 2020.  Even assuming *arguendo* that those events triggered the statute of limitations, however, such circumstances were not an "emergency" presenting an "imminent[] threat[]" to "the safety of human life or the protection of property" as required by the Anti-Deficiency Act.  *See* 31 U.S.C. § 1342.  An inability to seek penalties or disgorgement for some allegations in a complaint is not an emergency threat to "property" or "human life."  There is no property right in civil penalties.  There also is no property right in disgorgement (which is an equitable, not legal remedy), particularly where the investors (whose lost funds purportedly would be disgorged) already had been compensated via the class-action settlement described above.  And, as with all purported "emergency" justifications the SEC might seek to manufacture, the potential expiration in November 2025 of some small subset of the relevant statutes of limitations cannot have been the sudden, unexpected circumstance that an "emergency" requires, particularly where (i) the SEC staff had ample time to bring suit months or years earlier, and (ii) the shutdown itself was highly foreseeable and forecast in news media for months.  *See supra* ¶ 47.  The approaching expiration

of a statute of limitations as a result of an agency's own delay also does not constitute an "emergency." *See Wash. Alliance of Tech. Workers*, 202 F. Supp. 3d at 26; *Envtl. Def. Fund*, 716 F.2d at 920–21.

76.     The lack of any genuine emergency also explains why the staff never at any point referenced an impending November deadline during the Wells call before the shutdown began. For these reasons, the filing of the SDNY Action was an extraordinary violation of the Anti-Deficiency Act and the SEC's Contingency Plan.

77.     This Court is the appropriate forum to adjudicate Mr. Koneru's challenge to the SEC's unlawful action.  As of the date of this filing, the SEC has not served (and may not succeed in serving) Mr. Koneru with the complaint in the SDNY Action.  Moreover, the Southern District of New York court lacks personal jurisdiction over Mr. Koneru and is not the proper venue for any action premised on the allegations in the complaint.

78.     This action presents different claims (violations of the Anti-Deficiency Act) than the SDNY Action (alleged violations of securities laws).  The claims in this action arise out of a different nucleus of operative fact (the SEC's activities during the government shutdown in 2025) than the claims in the SDNY Action (Triterras's business in 2020).  The SEC's headquarters and many of the relevant witnesses and events are located in Washington, D.C.

79.     The interests of justice require litigating this matter in this forum.  Because the SEC's filing was unlawful and in bad faith, the SEC's Complaint is null and void.  For that reason, the SEC's choice of forum should receive no weight or deference, especially in light of the gamesmanship that occurred prior to the filing.  Judicial economy also favors adjudication in a forum where courts are better equipped to address litigation against federal agencies.

80.     Mr. Koneru also would suffer irreparable harm if he were required to litigate these claims in an improper forum where his claims never may be heard or heard only after significant delay.  Mr. Koneru intends to contest personal jurisdiction, venue, and the sufficiency of the Complaint in the SDNY Action.  Mr. Koneru has no immediate opportunity to bring these

counterclaims in the SDNY Action, and in any event, Mr. Koneru may not bring counterclaims against the SEC in an enforcement action without the SEC's consent.  *See* 15 U.S.C. § 78u(g).

## CLAIMS FOR RELIEF

### Count I – Violation of the Anti-Deficiency Act (5 U.S.C. §§ 702, 706; 31 U.S.C. § 1341)

### (Filing of the SDNY Action)

81.     Mr. Koneru repeats and realleges the allegations in Paragraphs 1 through 80 as if fully set forth herein.

82.     The staff's filing of the Complaint in the SDNY Action was final agency action under the APA, 5 U.S.C. § 551(13).

83.     The staff's filing of the Complaint in the SDNY Action was not an "emergency" and instead was an "ongoing, regular function of government the suspension of which would not imminently threaten the safety of human life or the protection of property" as set forth in the Anti-Deficiency Act.  31 U.S.C. § 1342.

84.     The staff had no authority to undertake any non-emergency actions under the Anti-Deficiency Act.  The SEC staff had no discretion to interpret "emergency" to allow the filing of the SDNY Action under the Anti-Deficiency Act.  5 U.S.C. § 706; 31 U.S.C. § 1342.

85.     The APA provides that courts may "hold unlawful" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  The SEC's filing of the SDNY Action was arbitrary, capricious, and not in accordance with law because it violated the Anti-Deficiency Act.

86.     The staff's filing of the Complaint in the SDNY Action also violated the SEC's Contingency Plan, confirming that the decision to file the SDNY Action was arbitrary, capricious, and not in accordance with law.  It is a "familiar rule of administrative law that an agency must abide by its own regulations," *Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990), including internal procedures, *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003).

87. The Administrative Procedure Act provides for judicial review of final agency action, such as the filing of the Complaint in the SDNY Action. *See* 5 U.S.C. § 702.

88. Mr. Koneru has no adequate remedy at law apart from this lawsuit for at least the following reasons:

    a. The SDNY Action does not provide Mr. Koneru with an adequate remedy at law, because the filing of the SDNY Action itself was *ultra vires* and unauthorized under the Anti-Deficiency Act.

    b. Mr. Koneru cannot bring counterclaims in the SDNY action without the SEC's consent. *See* 15 U.S.C. § 78u(g).

    c. Requiring Mr. Koneru to litigate the SEC's extraordinary Anti-Deficiency Act violations in the SDNY Action would not be an "adequate" remedy because, to the contrary, the SEC's filing of the SDNY Action itself is the legal wrong. The problem here is that the SDNY Action would not exist if the SEC had followed the law. In order to remedy that wrong in the SDNY Action, Mr. Koneru would be forced to proceed as though the SDNY Action were valid, effectively denying him redress for that wrong.

    d. That is particularly true where certain of the SEC staff's Anti-Deficiency Act violations (such as downloading documents during the lapse in appropriations) may be shown via the evidentiary record. Requiring Mr. Koneru to litigate these violations in the SDNY Action would be highly inequitable, given that Mr. Koneru should not be required to litigate in the *ultra vires* SDNY Action **at all**.

    e. Requiring Mr. Koneru to litigate his Anti-Deficiency Act claims in the SDNY Action also would amount to deferring to the SEC staff's choice of forum—effectively, and inequitably, rewarding the staff for their illegal filing.

    f. Requiring Mr. Koneru to litigate his Anti-Deficiency Act claim in the SDNY Action also would require that Mr. Koneru waive personal jurisdiction and service.

Mr. Koneru has strong grounds for objecting to personal jurisdiction in the SDNY Action, and Mr. Koneru has not been served with the SDNY Action. These additional obstacles confirm that any purported relief in the SDNY Action is not adequate.

89.     Mr. Koneru suffered and will continue to suffer irreparable harm from the filing of the Complaint in the SDNY Action. Mr. Koneru is suffering reputational harms on account of the filing of the SDNY Action, and those harms are both irreparable and increasing so long as the SDNY Action is ongoing. Mr. Koneru also cannot be made whole via monetary damages for the financial harms the illegal filing of the SDNY Action has caused and is causing him, confirming that the SDNY Action is causing irreparable harm.

90.     The filing of the Complaint in the SDNY Action and all related activities during the government shutdown must be set aside and declared null, void, and of no legal effect under the APA and the Anti-Deficiency Act. 5 U.S.C. § 702; 31 U.S.C. § 1342. *See, e.g.*, *Aponte v. Liggett Grp.*, No. 13 CIV. 569 JMF, 2014 WL 1087977, at *1 (S.D.N.Y. Mar. 18, 2014) (holding that complaint filed without legal capacity is a "legal nullity").

91.     The SEC must dismiss the Complaint in the SDNY Action and must be enjoined from otherwise continuing the SDNY Action. *See* 5 U.S.C. § 702; 31 U.S.C. § 1342.

**Count II – Declaratory Judgment (28 U.S.C. § 2201)**

92.     Mr. Koneru repeats and realleges the allegations in Paragraphs 1 through 91 as if fully set forth herein.

93.     The SEC staff's filing of the Complaint in the SDNY Action presents an actual controversy under 28 U.S.C. § 2201.

94.     The staff's filing of the Complaint in the SDNY Action was not an "emergency" and instead was an "ongoing, regular function of government the suspension of which would not imminently threaten the safety of human life or the protection of property" as set forth in the Anti-Deficiency Act. 31 U.S.C. § 1342.

95.     The staff had no authority to undertake any non-emergency actions under the Anti-Deficiency Act.  The SEC staff had no discretion to interpret "emergency" to allow the filing of the SDNY Action under the Anti-Deficiency Act.  5 U.S.C. § 706.

96.     The filing of the SDNY Action was unlawful under the Anti-Deficiency Act.  31 U.S.C. § 1342.

97.     Mr. Koneru suffered and will continue to suffer irreparable harm from the staff's illegal filing of the Complaint in the SDNY action.

98.     The SDNY Action, including the Complaint filed on November 7, 2025, and any other subsequent filings in the SDNY Action, should be declared null, void, and of no legal effect for all purposes in law and equity.  5 U.S.C. § 706; 31 U.S.C. § 1342.  *See, e.g.*, *Aponte,* 2014 WL 1087977, at *1.

99.     For the reasons stated herein, Mr. Koneru is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Procedure 57.

## **PRAYERS FOR RELIEF**

100.     Mr. Koneru repeats and realleges the allegations in Paragraphs 1 through 99 as if fully set forth herein.

101.     Mr. Koneru prays that the Court grant the following relief:

a.     Declare that the complaint in the SDNY Action was null, void, and of no legal effect for all purposes in law and equity;

b.     Order the SEC to dismiss the complaint and enjoin the SEC from filing any amended complaint or otherwise continuing the SDNY Action; and

c.     Award such other relief as is just and proper.

## JURY DEMAND

Mr. Koneru hereby demands trial by jury for all counts and issues so triable.

Respectfully submitted,

DATED:  November 23, 2025          */s/ Bradley J. Bondi*
                                   */s/ Ronald K. Anguas, Jr.*

Bradley J. Bondi (D.C. Bar No.: 465132)
(*Pending Admission*)
Ronald K. Anguas, Jr. (D.C. Bar. No: 1023356)
Igor V. Timofeyev (D.C. Bar. No. 998291)
Neil J. Schumacher (D.C. Bar No.: 1028760)
(*Pending Admission*)
Nicholas J. Griepsma (D.C. Bar No.: 1656672)
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
(202) 551-1700
bradbondi@paulhastings.com
ronaldanguas@paulhastings.com
igortimofeyev@paulhastings.com
neilschumacher@paulhastings.com
nicholasgriepsma@paulhastings.com

***Attorneys for Plaintiff***
***Srinivas Koneru***