**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SRINIVAS KONERU,

Plaintiff,

v.

SECURITIES & EXCHANGE COMMISSION,

100 F Street, NE
Washington, DC 20549

Defendant.

Case No. 1:25-CV-4100-SLS

**PLAINTIFF SRINIVAS KONERU'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT SECURITIES & EXCHANGE COMMISSION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

ORAL ARGUMENT REQUESTED



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

BACKGROUND ..... 4

LEGAL STANDARD ..... 7

ARGUMENT ..... 8

I. THE SEC'S PROCEDURAL ATTEMPTS TO ESCAPE THE AGENCY'S ANTI-DEFICIENCY ACT VIOLATION LACK MERIT ..... 8

A. Mr. Koneru Has Article III Standing. ..... 8

1. Mr. Koneru Suffered—and Continues To Suffer—an Injury in Fact. ..... 9

2. This Court Has the Ability To Redress Mr. Koneru's Injury. ..... 12

B. The SEC's "Zone of Interests" Arguments Do Not Detract from Mr. Koneru's Right To Sue. ..... 13

C. The SEC's Decision To File a Lawsuit During the Shutdown Was a Final Agency Action. ..... 15

1. The SEC's Decision To File the SDNY Action Was an "Agency Action." ..... 15

2. The SEC's Decision To File the SDNY Action Was a "Final Agency Action." ..... 16

D. The Anti-Deficiency Act Does Not Override the Strong Presumption in Favor of Judicial Review. ..... 23

E. Mr. Koneru Has No Adequate Remedy in the SDNY Action. ..... 25

II. MR. KONERU ADEQUATELY ALLEGES A VIOLATION OF THE ANTI-DEFICIENCY ACT ..... 27

A. The SEC's Routine Litigation Was Not Necessary for "the Protection of Property." ..... 28

B. The SEC's Routine Litigation Filing Five Years into Its Investigation of a Retired Executive Was Not an "Emergency." ..... 35

C. The SEC's Violation of Its Own Contingency Plan Confirms That the Filing of the SDNY Action Violated the Administrative Procedure Act. ..... 41

III. THE SEC'S ARGUMENTS REGARDING REQUESTED RELIEF ARE PREMATURE AND MISUNDERSTAND THE REQUEST FOR RELIEF. ..... 43

CONCLUSION ..... 45




PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acuity Ins. Co. v. McDonald's Towing & Rescue, Inc.*,
747 F. App'x 377 (6th Cir. 2018) ....................37

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
803 F. Supp. 3d 164 (D.D.C. 2025) ....................9

*Air Line Pilots Ass'n, Int'l v. Chao*,
889 F.3d 785 (D.C. Cir. 2018) ....................39

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*,
807 F. Supp. 3d 1004 (N.D. Cal. 2025) ....................24

*Am. Nat'l Ins. Co. v. FDIC*,
642 F.3d 1137 (D.C. Cir. 2011) ....................7

*Am. Fin. Benefits Ctr. v. FTC*,
2018 WL 3203391 (N.D. Cal. May 29, 2018) ....................21

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ....................13, 14

*Aponte v. Liggett Group*,
2014 WL 1087977 (S.D.N.Y. March 18, 2014) ....................44

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
397 U.S. 150 (1970) ....................11

*AT&T Co. v. EEOC*,
270 F.3d 973 (D.C. Cir. 2001) ....................22

*Athlone Indus., Inc. v. Consumer Product Safety Commission*,
707 F.2d 1485 (D.C. Cir. 1983) ....................22

*Avila v. NLRB*,
2025 WL 859223 (D.D.C. Mar. 19, 2025) ....................25

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ....................25, 26, 45

*Barhoumi v. Obama*,
234 F. Supp. 3d 84 (D.D.C. 2017) ....................11

*Bauer v. Marmara*,
774 F.3d 1026 (D.C. Cir. 2014) ....................11

*Bellion Spirits, LLC v. United States*,
7 F.4th 1201 (D.C. Cir. 2021) ....................20

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................2, 16, 17, 18

*Blackman v. Dist. of Columbia*,
456 F.3d 167 (D.C. Cir. 2006) ....................28

*Broadstreet, Inc. v. SEC*,
2025 WL 417933 (N.D. Tex. Feb. 6, 2025) ....................18

*Bunge Corp. v. United States*,
5 Cl. Ct. 511 (1984) ....................39

*Buntrock v. SEC*,
2003 WL 260681 (N.D. Ill. Feb. 6, 2003) ....................27

*Buntrock v. SEC*,
347 F.3d 995 (7th Cir. 2003) ....................11, 21, 27, 45

*Cabrera v. U.S. Dep't of Lab.*,
792 F. Supp. 3d 91 (D.D.C. 2025) ....................8

*Carlson v. Department of Energy*,
2019 WL 3997383 (D.N.M. Aug. 23, 2019) ....................44

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ....................9

*City of Oakland v. Holder*,
901 F. Supp. 2d 1188 (N.D. Cal. 2013) ....................16

*Climate United Fund v. Citibank, N.A.*,
778 F. Supp. 3d 90 (D.D.C. 2025) ....................8, 9

*Comm'r. v. Clark*,
489 U.S. 726 (1989) ....................29, 36

*Cont. Cartage Co. v. Morris*,
59 F.2d 437 (E.D. Ill. 1932) ....................38

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025) ....................32

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
33 F.4th 584 (D.C. Cir. 2022) ....................12, 13

*Ctr. for Biological Diversity v. Trump*,
453 F. Supp. 3d 11 (D.D.C. 2020) ....................9

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ....................9

*Davis v. Unitel Voice, LLC*,
2021 WL 1158178 (D.N.J. Mar. 18, 2021) ....................39

*Drs. for Am. v. Off. of Pers. Mgmt.*,
766 F. Supp. 3d 39 (D.D.C. 2025) ....................17

*Elevance Health, Inc. v. Becerra*,
736 F. Supp. 3d 1 (D.D.C. 2024) ....................42



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

*Envtl. Def. Fund, Inc. v. EPA*,
716 F.2d 915 (D.C. Cir. 1983) ....................39

*EPA v. Calumet Shreveport Ref., LLC*,
145 S. Ct. 1735 (2025) ....................30

*In re Fair Fin. Co.*,
13 F.4th 547 (6th Cir. 2021) ....................34

*Farm Bureau Gen. Ins. Co. of Mich. v. Schneider Nat'l Carriers, Inc.*,
2023 WL 4108494 (S.D. Ohio June 21, 2023) ....................38

*FDA v. R. J. Reynolds Vapor Co.*,
606 U.S. 226 (2025) ....................14

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ....................32

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) ....................10, 12

*Franklin v. Pepco Holdings, Inc.*,
875 F. Supp. 2d 66 (D.D.C. 2012) ....................10

*Friedman v. Leavitt*,
2008 WL 9409136 (D.D.C. Dec. 5, 2008) ....................12

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ....................15, 16

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ....................24

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ....................28

*In re Halpin*,
566 F.3d 286 (2d Cir. 2009) ....................33

*Hand v. Perez*,
2015 WL 3534162 (D.D.C. June 5, 2015) ....................10

*Hardaway v. D.C. Hous. Auth.*,
843 F.3d 973 (D.C. Cir. 2016) ....................9

*Hazardous Waste Treatment Council v. Thomas*,
885 F.2d 918 (D.C. Cir. 1989) ....................14

*Henning v. Wachovia Mortg., FSB*,
969 F. Supp. 2d 135 (D. Mass. 2013) ....................12

*HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*,
594 U.S. 382 (2021) ....................36

*Indep. Bankers Ass'n of Am. v. Farm Credit Admin.*,
164 F.3d 661 (D.C. Cir. 1999) ....................31

*Intra-Nat'l Home Care, LLC v. U.S. Dep't of Lab.*,
2024 WL 4100245 (3d Cir. Sept. 6, 2024) ....................16

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
943 F.3d 953 (D.C. Cir. 2019) ....................20

*In re Istook*,
B-285725, 2000 WL 1528747 (Sept. 29, 2000) ....................40

*Kaul v. Federation of State Medical Boards*,
2021 WL 6549978 (D.D.C. Nov. 23, 2021) ....................10

*Kokesh v. SEC*,
581 U.S. 455 (2017) ....................33, 34

*Kozup v. Georgetown Univ.*,
906 F.2d 783 (D.C. Cir. 1990) ....................37

*LabMD, Inc. v. FTC*,
776 F.3d 1275 (11th Cir. 2015) ....................21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ....................13

*Liu v. SEC*,
591 U.S. 71 (2020) ....................33

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................9

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) ....................23

*Mann v. SEC*,
2025 WL 2779255 (E.D. La. Sept. 30, 2025) ....................21

*Maracich v. Spears*,
570 U.S. 48 (2013) ....................29

*Marshall v. Pasadena Unif. Sch. Dist.*,
15 Cal. Rptr. 3d 344 (Cal. App. 2004) ....................38

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ....................13

*Matter of: U.S. Dept. of Ag. – Operations of the Farm Services Agency During the Fiscal Year 2019 Lapse in Appropriations*,
B-331092, 2020 WL 3501349 (June 29, 2020) ....................34

*Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*,
107 F.3d 979 (2d Cir. 1997) ....................26

*Moghaddam v. Pompeo*,
424 F. Supp. 3d 104 (D.D.C. 2020) ....................42

*Morgan Drexen, Inc. v. CFPB*,
785 F.3d 684 (D.C. Cir. 2015) ....................26, 27

*Motamed v. Chubb Corp.*,
2016 WL 1162853 (D.N.J. Mar. 24, 2016)....................44

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998)....................13

*NAACP v. Meese*,
615 F. Supp. 200 (D.D.C. 1985)....................26

*Nagel v. Gerald Dennen & Co.*,
650 N.E.2d 547 (Ill. App. 1995)....................38

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014)....................17

*Neguse v. ICE*,
--- F. Supp. 3d ---, 2025 WL 3653597 (D.D.C. Dec. 17, 2025)....................23, 24

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019)....................36

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
496 F. Supp. 3d 31 (D.D.C. 2020)....................29

*Ordonez Orozco v. Chertoff*,
2008 WL 5155728 (S.D. Tex. Dec. 8, 2008)....................33

*Paulin v. George Wash. Univ. Sch. of Med. & Health Scis.*,
878 F. Supp. 2d 241 (D.D.C. 2012)....................8, 41

*Payne v. City of Houston*,
2025 WL 999085 (5th Cir. Apr. 3, 2025)....................37

*Pearson v. Callahan*,
555 U.S. 223 (2009)....................26

*Powell-Ferri v. Ferri*,
326 Conn. 457 (2017)....................33

*Purdue Univ. v. Scalia*,
2020 WL 7340156 (D.D.C. Dec. 14, 2020)....................39

*Rhea Lana, Inc. v. Dep't of Lab*,
824 F.3d 1023 (D.C. Cir. 2016)....................2, 17, 19, 20, 22

*Sackett v. EPA*,
566 U.S. 120 (2012)....................19

*Scaccia v. Borough of Old Forge*,
373 Pa. 161 (1953)....................38

*SEC v. Jarkesy*,
603 U.S. 109 (2024)....................34

*SEC v. Musk*,
2026 WL 279790 (D.D.C. Feb. 3, 2026)....................26



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

*Simpson v. Evolve Fed. Cred. Union*,
2022 WL 16518212 (W.D. Tex. Oct. 24, 2022) ....................10

*Sprint Comm. Co., L.P. v. APCC Servs., Inc.*,
554 U.S. 269 (2008) ....................33

*Steinberg v. Gray*,
815 F. Supp. 2d 293 (D.D.C. 2011) ....................44

*The Wilderness Society v. Norton*,
434 F.3d 58 (D.C. Cir. 2006) ....................42

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ....................17, 18, 19, 20, 22

*United States v. Project on Gov't Oversight*,
572 F. Supp. 2d 73 (D.D.C. 2008) ....................33

*United States v. Tobin*,
480 F.3d 53 (1st Cir. 2007) ....................29

*United States v. Williams*,
553 U.S. 285 (2008) ....................28, 29

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
202 F. Supp. 3d 20 (D.D.C. 2016) ....................3, 39

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*,
537 U.S. 371 (2003) ....................29

*Water Transportation Ass'n v. ICC*,
819 F.2d 1189 (D.C. Cir. 1987) ....................11

*Wimberly v. Lab. & Indus. Rels. Comm'n of Mo.*,
479 U.S. 511 (1987) ....................40

*Yates v. United States*,
574 U.S. 528 (2015) ....................28

**Statutes**

5 U.S.C. § 551 ....................15, 16

5 U.S.C. § 701 ....................27

5 U.S.C. § 702 ....................14

5 U.S.C. § 704 ....................8

5 U.S.C. § 706 ....................8

11 U.S.C. § 541 ....................31

15 U.S.C. § 78u ....................7, 27. 35

18 U.S.C. § 1963 ....................31

21 U.S.C. §§ 601–695 ....................30



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

21 U.S.C. § 853 ....................31

22 U.S.C. § 1643b ....................32

31 U.S.C. § 1342 ....................1, 2, 5, 27, 28, 30, 36, 40

42 U.S.C. § 18752 ....................32

50 U.S.C. § 4329 ....................32

**Other Authorities**

17 C.F.R. § 202.5 ....................4

31 C.F.R. § 1020.210 ....................10

3 Comp. Gen. 979 (1924) ....................29

*Defending Corps. & Indiv. in Gov't Investigations* (2025) ....................17

Emergency, American Heritage Dictionary, Houghton Mifflin Co. (2d Coll. ed. 1982) ....................36

Emergency, Black's Law Dictionary (12th ed. 2024) ....................37

Emergency, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/emergency (last visited Mar. 17, 2026) ....................36

Emergency (4.a.i), Oxford English Dictionary, Oxford Univ. Press (Dec. 2024) ....................37

J.R. Stark, *An Important SEC Case You're Probably Not Watching* (Jan. 26, 2026), https://www.linkedin.com/pulse/important-sec-case-youre-probably-watching-john-reed-stark-ckxne/ ....................42

SEC Enforcement Manual, https://www.sec.gov/divisions/enforce/enforcementmanual.pdf ....................4

S. Doc. No. 79-248 (1946) ....................16

Threat, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/threat (last visited Mar. 17, 2026) ....................29

Wright & Miller, Fed. Prac. & Proc. (2d ed.) ....................42

## INTRODUCTION

Plaintiff Srinivas Koneru brings this action to remedy a blatant violation of the Anti-Deficiency Act by the Securities & Exchange Commission ("SEC"), which culminated in the unlawful filing of an enforcement action against him during the government shutdown in the fall of 2025. The SEC seeks to justify its illegal conduct by framing this routine filing as a purported "emergenc[y]" involving the "protection of property" and therefore permissible under the Anti-Deficiency Act's narrow exception for clear, tangible threats to the public. *See* 31 U.S.C. § 1342. There was no "imminent[] threat[]" requiring "protection of property," however, and any perceived urgency was a consequence of the SEC's own delay.

The SEC's investigation was not a new or exigent matter. Beginning in 2020, the SEC subjected Mr. Koneru, a respected entrepreneur and founder of the company that was acquired and became Triterras, Inc., to an aimless, nearly five-year-long investigation. The SEC's extensive delay caused its purported claims to become stale before last year's government shutdown ended, and so the SEC rushed to prepare and file a hasty enforcement action against Mr. Koneru to prevent the statute of limitations on certain remedies from expiring. The SEC's actions were nothing more than "ongoing, regular functions of government," which federal agencies may not continue during a lapse in appropriations. 31 U.S.C. § 1342.

No one is above the law, and the SEC's *post hoc* rationalizations for violating the law fall short. In tacit recognition of its inability to meet the requirements of the Anti-Deficiency Act's narrow exception for clear and tangible threats to the public, the SEC seeks to distract by focusing on purported procedural deficiencies in this lawsuit. Those arguments fail.

***First***, Mr. Koneru has Article III standing. An illegal enforcement action causes Mr. Koneru long-recognized injuries in fact, and Mr. Koneru more than adequately alleges additional financial and reputational injuries. The Court can and should redress those injuries by enjoining



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

continuation of the illegal suit against Mr. Koneru.

***Second***, Mr. Koneru can challenge the SEC's enforcement action under the Administrative Procedure Act ("APA"). Mr. Koneru's lawsuit protects Congress's power of the purse, and so his APA claim falls within the Anti-Deficiency Act's zone of interests. His APA claim also appropriately targets "agency action" (the decision to file a lawsuit during the government shutdown), which was "final" under well-established precedent. The filing represented the "consummation of the agency's decision making," *Bennett v. Spear*, 520 U.S. 154, 177 (1997) (citation omitted), because filing an action in federal court is the end of the SEC's deliberative process. The filing caused "legal consequences" to "flow[]," because (as the SEC's motion admits) the filing was timed to increase Mr. Koneru's exposure to disgorgement and penalties. *See, e.g.*, *Rhea Lana, Inc. v. Dep't of Lab*, 824 F.3d 1023, 1027 (D.C. Cir. 2016) (citation omitted) (exposure to penalties rendered action final and reviewable). And contrary to the SEC's assertions, no provision of the Anti-Deficiency Act overrides the APA's presumption of judicial review, *see* Part I.D, and Mr. Koneru has no adequate remedy merely in defending himself in an unlawful proceeding, *see* Part I.E.

***Third***, on the merits, there was no "imminent[] threat[]" necessitating the SEC to act for "the protection of property" as required by the Anti-Deficiency Act. 31 U.S.C. § 1342. This exception is narrow and permits government action during a lapse in appropriations only when emergencies pose tangible threats to the public. Congress intended that the exception relate to a significant "threat[]"—*i.e.*, a force that may "inflict evil, injury, or damage," Threat, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/threat (last visited Mar. 17, 2026)—on par with "the safety of human life," 31 U.S.C. § 1342. Canons of statutory construction and the SEC's own citations confirm that an action to prevent a "threat" to the "protection of property"





PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

in this context means more than the preservation of abstract and unproven claims in not-yet-filed litigation. "Protection of property" here means more than "protection of claims" or "protection of remedies" such as disgorgement. If Congress had intended the Anti-Deficiency Act's exception to embrace these abstract unproven interests, Congress could have said so. And if Congress had intended an expansive or technical meaning of "protection of property," Congress could have defined that term or used one of the many other more specific terms Congress has employed in dozens of other federal statutes.

***Fourth***, the SEC also cannot establish that any "emergency" existed under the facts alleged. The SEC has known the statute of limitations for any claims based on the acquisition of Triterras since the day it opened its investigation in 2020. The SEC received the core documents relied upon in the enforcement action in 2022 and 2023. (Compl. ¶ 29.) The shutdown itself was anticipated widely. (*Id.* ¶ 47.) The SEC sought no "emergency relief" such as an asset freeze or temporary restraining order either during that years-long period or after the SEC filed its enforcement action because there was no potential for ongoing harm (or any harm) to investors. (*Id.* ¶ 73.) The SEC's "own delay" cannot give rise to a true "emergency." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016) (delay causing an agency to risk meeting a deadline is not an "emergency"). Congress intended to allow agencies to respond to critical and unanticipated threats, not to provide an escape hatch for agencies' failures to carry out their ordinary responsibilities earlier.

Mr. Koneru sufficiently alleges that the SEC violated the Anti-Deficiency Act by filing a routine enforcement action during the lapse in appropriations. The Court should deny the SEC's motion to dismiss.



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

## BACKGROUND

This action addresses the SEC's violation of the Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.*, during the government shutdown last fall—specifically, its filing of an enforcement action in the Southern District of New York (the "SDNY Action"). (Compl. ¶ 1.) That unlawful action was the culmination of the SEC staff's nearly five-year investigation of Triterras and Mr. Koneru. (*Id.*) In early 2021, the SEC staff opened an investigation of Triterras and thereafter investigated many theories of purported securities violations without finding wrongdoing. (*Id.* ¶ 20.) Triterras produced thousands of documents in 2022 and 2023. (*Id.* ¶ 20(a).) The staff conducted numerous witness interviews. (*Id.* ¶ 20(b).) The staff subpoenaed Mr. Koneru for additional documents and testimony. (*Id.* ¶ 20(d).) The staff concluded the final witness interview in February 2025 and received the final documents from Mr. Koneru in May 2025. (*Id.* ¶ 20(g), (h).) Over this several-year period, the staff repeatedly declined offers from defense counsel to present on topics of interest. (*Id.* ¶ 22.) Then, after months of inaction, the staff issued a Wells notice to Mr. Koneru on the eve of the government shutdown relating to purported violations the staff previously had not investigated. (*Id.* ¶ 24.)[1] By issuing a Wells notice relating to these never-investigated theories, the staff departed from the SEC's own internal procedures meant to guarantee due process to

[1] The Wells process is the SEC's internal procedure requiring disclosure and substantive engagement with a respondent prior to filing charges. During the Wells process, the SEC staff "may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them." 17 C.F.R. § 202.5(c). The Wells process also allows respondents to submit a "Wells submission," *i.e.*, "a written statement to the Commission setting forth their interests and position[s] in regard to the subject matter of the investigation." *Id.* The SEC staff also may allow respondents to review the investigative file and hold additional meetings with the SEC staff and management. *See generally* SEC Enforcement Manual § 2.3, https://www.sec.gov/divisions/enforce/enforcementmanual.pdf. Chairman Atkins described the Wells process "as an extension of due process and fundamental constitutional rights that play an integral role in protecting citizens from a powerful government agency that could become policeman, prosecutor, judge, jury, and executioner all in one." (Compl. ¶ 27.)

defendants. (*Id.* ¶¶ 7, 24–28.)[2] Worse, and as relevant here, the Wells notice foreshadowed what rapidly would become an unlawful pursuit of Mr. Koneru during the government shutdown. (*Id.* ¶¶ 29–35.)

"On October 1, 2025, the SEC's appropriations lapsed, and a government shutdown began." (*Id.* ¶ 37). Over the next several weeks, the agency nevertheless engaged in a series of non-emergency activities, culminating in the subject of this suit—the filing of the SDNY Action. These activities included (i) "engag[ing] in routine, non-emergency correspondence which required the use of government resources including computers and email servers" (*id.* ¶¶ 49–52); (ii) "engag[ing] in routine, non-emergency investigative work by reviewing Mr. Koneru's Wells submission and exhibits" (*id.* ¶¶ 53–55); (iii) "engag[ing] in internal discussions" about the SEC staff's investigation of Mr. Koneru (*id.* ¶ 56); (iv) "present[ing] its investigation to the Commission" (*id.* ¶ 57); and, most importantly, (v) "fil[ing] the Complaint against Mr. Koneru in the Southern District of New York" (*id.* ¶ 67).

The SEC had no legitimate basis to continue its investigation of Mr. Koneru or to initiate litigation against him during this period. The Anti-Deficiency Act expressly forbids federal officers and employees from engaging in "ongoing, regular functions of government" "except for emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342.

---

[2] Although Mr. Koneru's Complaint in this case seeks relief related only to "final" agency action in the form of the filing of the SDNY Action, that Anti-Deficiency Act violation was accompanied by additional violations of the SEC's own internal procedures and norms. (Compl. ¶¶ 7, 20–36.) These actions included failing to investigate the factual basis for the enforcement action (*id.* ¶ 21); refusing to meet with defense counsel about the staff's investigation (*id.* ¶ 22); disregarding the Wells process (*id.* ¶¶ 29, 30); demanding a ***backdated*** tolling agreement (*id.* ¶ 30); conditioning standard meetings with SEC leadership on signing a tolling agreement (*id.* ¶¶ 30, 31); providing no settlement offer or opportunity for settlement discussions (*id.* ¶ 32); and failing to recuse biased staff members before they brought apparently retaliatory charges (*id.* ¶ 33).

There was no "property" the SEC needed to protect here. Mr. Koneru's Complaint alleges that "there is no threat (let alone an imminent one) to … 'protection of property' whatsoever," because there was "no ongoing public company whose property (or whose investors' property) could need protecting," and because "[a]n inability to seek penalties or disgorgement for some allegations in a complaint is not an emergency threat to 'property.'" (Compl. ¶¶ 44, 75.)

There also was no true "emergency." Mr. Koneru's Complaint alleges that the "staff's activity during the shutdown was not a response to any imminent safety threat to human life or an effort to protect any existing property interest of the federal government from such a threat." (*Id.* ¶¶ 3, 39–43.) Any exigent circumstances resulted from the staff's own delay in progressing the investigation for nearly five years. (*Id.* ¶ 46.) The staff's actions therefore were not justified by any "emergency" threatening "human life" or "property" and so violated the Anti-Deficiency Act and the SEC's own Contingency Plan. (*Id.* ¶¶ 61–66.)

The SEC's own actions in filing the SDNY Action further undermine the theory that the SDNY Action was motivated by any true "emergency." The SDNY Action was not subject to any court-established deadlines the SEC risked missing. (*Id.* ¶ 69.) In initiating the SDNY Action, the SEC staff relied on alleged conduct, including presentations and securities filings, that occurred nearly five years prior. (*Id.* ¶ 70.) Most of the documents that the staff relied upon were produced in 2022 and 2023 or were mandatory disclosures filed with the SEC from 2020 through March 2022. (*Id.* ¶ 72 (citing Declaration of Neil J. Schumacher ¶¶ 4–5 & App. A); *see* Compl. Ex. A at 1–2 (Email from SEC identifying documents referenced on the Wells call).) Even after filing the SDNY Action, the staff never sought emergency relief. (Compl. ¶ 73.) And any concern about the possible expiration of the statute of limitations for only certain remedies (not the entire lawsuit) was not a cognizable "emergency" under the Anti-Deficiency Act. (*Id.* ¶¶ 74–76.) The SEC does



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

not (and cannot) argue that ***all*** limitations periods would have expired had the SEC followed the law and waited until appropriations were restored. The SEC still could have sought disgorgement based on intentional wrongdoing (assuming the SEC had evidence of intentional wrongdoing, which it does not) and other equitable remedies. The limitations period for disgorgement based on claims involving scienter and for other equitable remedies is ten years. *See* 15 U.S.C. § 78u(d)(8)(A)(ii), (B).

Finally, Mr. Koneru's Complaint alleges immediate, ongoing, and cognizable injury to Mr. Koneru from the SEC's illegal and *ultra vires* actions. (Compl. ¶¶ 77–80, 88–89.) In particular, following a period of litigation gamesmanship by the SEC, the SEC rushed to file an illegal action in an improper forum lacking jurisdiction and venue to hear the SEC's claims. (*Id.* ¶¶ 77–80.) The Complaint alleges that Mr. Koneru cannot obtain the same relief in the SDNY Action and would suffer irreparable harm if he were forced to raise certain of these arguments merely as defenses rather than counterclaims. (*Id.* ¶¶ 80, 88–89.) The Complaint further alleges that Mr. Koneru is suffering reputational harms and financial harms. (*Id.*)

The Complaint asserts two claims for relief: Count I alleges that the filing of the SDNY Action was unlawful agency action under the APA because it was contrary to the Anti-Deficiency Act, the SEC's Contingency Plan, and the agency's own procedures. (*See id.* ¶¶ 85–86.) Count II seeks relief under the Declaratory Judgment Act and asks that the Complaint filed in the SDNY Action be declared null and void. (*Id.* ¶ 98.)

## LEGAL STANDARD

Courts deciding motions to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the

facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation omitted) (reversing dismissal).

Similarly, "[t]o survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead enough facts to state a claim to relief that is plausible on its face and to nudge[ ] [his or her] claims across the line from conceivable to plausible." *Paulin v. George Wash. Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 245 (D.D.C. 2012) (citation omitted). The court must "assume all the allegations in the complaint are true" and "give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Id.* at 245–46 (citation omitted).

## ARGUMENT

### I. THE SEC'S PROCEDURAL ATTEMPTS TO ESCAPE THE AGENCY'S ANTI-DEFICIENCY ACT VIOLATION LACK MERIT.

The APA provides that courts "shall set aside a final agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or taken 'without observance of procedure required by law.'" *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 102 (D.D.C. 2025) (quoting 5 U.S.C. § 706(2)(A), (D)). "Absent exceptions not relevant here … the APA authorizes judicial review of each 'final agency action for which there is no other adequate remedy in a court.'" *Id.* (quoting 5 U.S.C. § 704).

Here, filing the SDNY Action during the lapse in appropriations was "unlawful" because it violated the Anti-Deficiency Act. The SEC cannot escape accountability for its unlawful conduct through procedural maneuvering. Once this Court reaches the merits of Mr. Koneru's APA claim, that claim plainly survives a motion to dismiss.

#### A. Mr. Koneru Has Article III Standing.

Mr. Koneru meets the requirements for standing to seek injunctive and declaratory relief against the SEC's unlawful SDNY Action. "To establish Article III standing, a party must show

that: (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision." *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 104 (D.D.C. 2025). "At the motion to dismiss stage, plaintiffs need only 'state a plausible claim' that they meet the requirements for standing." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 27 (D.D.C. 2020) (citation omitted). Mr. Koneru satisfies each of the requirements for standing. His Complaint adequately alleges that he has suffered financial, legal, and reputational harms that are "traceable" to the SEC filing its SDNY Action during the recent government shutdown. *Citibank, N.A.*, 778 F. Supp. 3d at 104. Only this Court can redress the injuries caused by the SEC's illegal enforcement action against him through injunctive and declaratory relief.

**1. Mr. Koneru Suffered—and Continues To Suffer—an Injury in Fact.**

Mr. Koneru adequately alleges several types of injury in fact, each of which independently is sufficient for Article III standing. ***First***, Mr. Koneru has standing because he is the subject of an unlawful enforcement action. "As the Supreme Court has emphasized, when the plaintiff is herself 'an object of [government] action[,] … there is ordinarily little question that the action … has caused [her] injury.'" *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 977 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). Accordingly, the D.C. Circuit "has explained that standing is 'self-evident' when the plaintiff is herself 'the object of the challenged agency action.'" *Id.* (citation omitted).

***Second***, Mr. Koneru also alleges "financial harms" relating to the SDNY Action. (Compl. ¶ 89.) His Complaint gives rise to the reasonable inference that he is incurring financial costs. (*Id.*) And even "[a] dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount





PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

of money is ordinarily an 'injury.'"); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 175 (D.D.C. 2025) (similar).

***Third***, Mr. Koneru also adequately alleges reputational harm sufficient for standing. (Compl. ¶ 89.) "[I]njury to reputation can constitute a cognizable injury sufficient for Article III standing." *Foretich v. United States*, 351 F.3d 1198, 1211 (D.C. Cir. 2003) (need for protection against allegations of fraud most acute where potential defendants are professionals with reputations to protect); *Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66, 75 (D.D.C. 2012) ("false statements that impute to the subject a crime" or "a matter adversely affecting the person's ability to work in a profession" are defamation as a matter of law). Moreover, "[c]ase law is clear that where reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to challenge that action." *Foretich*, 351 F.3d at 1213. Here, Mr. Koneru adequately alleges such reputational harm—a natural consequence of an enforcement action alleging fraud initiated by the SEC.

The SEC errs in asserting that Mr. Koneru's reputational injuries are alleged inadequately. (*See* SEC's Motion To Dismiss, Dkt. 15 ("Mot.") at 11.) Mr. Koneru adequately alleges he is subject to reputational harms that "are both irreparable and increasing so long as the SDNY Action is ongoing." (Compl. ¶ 89.) And the SEC's cited cases are inapposite—both *Kaul v. Federation of State Medical Boards*, 2021 WL 6549978 (D.D.C. Nov. 23, 2021), and *Hand v. Perez*, 2015 WL 3534162 (D.D.C. June 5, 2015), had nothing to do with unlawful agency actions. Mr. Koneru's allegations that he suffers concrete reputational harm as the target of an unlawful enforcement action, taken in a light most favorable to him, establish such harm. Reputational risk assessments conducted by financial institutions, for example, consider ongoing SEC enforcement actions. *See* 31 C.F.R. § 1020.210(a)(2)(v) (requiring banks to incorporate "[a]ppropriate risk-



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

based procedures for conducting ongoing customer due diligence"); *see also Simpson v. Evolve Fed. Cred. Union*, 2022 WL 16518212, at *2 (W.D. Tex. Oct. 24, 2022) (discussing "customer due diligence efforts and the creation of customer risk profiles" as part of the U.S. Bank Secrecy Act). Ongoing harm to Mr. Koneru's reputation generates additional, concrete harm, including the risk of loss of financial and other services.[3]

The SEC also argues that Mr. Koneru "cannot show that he has a legally protected interest related to the [Anti-Deficiency Act]." (Mot. 11.) Mr. Koneru, however, is not bringing this case directly under the Anti-Deficiency Act. His suit is under the APA, which protects individuals from unlawful agency action. Interests protected by the APA are wide-ranging and "at times, may reflect 'aesthetic, conservational, and recreational' as well as economic values." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) (citation omitted). Here, Mr. Koneru has legally protected interests under the APA because (i) he is subject to unlawful final agency action as described below, and (ii) the allegations in his Complaint plausibly give rise to financial harm—both defending against an unlawful enforcement action and incurring any civil penalties or disgorgement that may result. The SEC cannot assert seriously that Mr. Koneru's economic injury does not amount to an "injury in fact." (Mot. 11.)

None of the SEC's citations somehow eliminates Article III standing when parties sue to stop unlawful agency action under the APA. In *Barhoumi v. Obama*, 234 F. Supp. 3d 84 (D.D.C. 2017), the plaintiff raised neither an APA claim nor even an allegation of unlawful agency action. *Id.* at 89. *Bauer v. Marmara*, 774 F.3d 1026 (D.C. Cir. 2014), concerned only a private right of

[3] The SEC also relies on *Buntrock v. SEC*, 347 F.3d 995 (7th Cir. 2003), to argue that "the public should not be deprived of a remedy against an adjudicated wrongdoer" because of misconduct by the federal agency. (Mot. 13.) But Mr. Koneru is not an "adjudicated wrongdoer," and the SEC and public have a remedy: the SEC can refile the SDNY Action now that appropriations are in place. Although the statute of limitations may have passed on certain non-scienter-based remedies, scienter-based remedies still will be available to the SEC should it wish to pursue them.



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

action under the "Neutrality Act," not Article III standing for an APA claim. *Id.* at 1028, 1036. *Water Transportation Ass'n v. ICC*, 819 F.2d 1189 (D.C. Cir. 1987), applied an outdated version of the zone-of-interests test, *id.* at 1195–96, which courts now recognize is "non-jurisdictional," *see CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 588 (D.C. Cir. 2022). Such inapposite cases do not detract from the well-established Article III injuries Mr. Koneru alleges here.[4]

### 2. This Court Has the Ability To Redress Mr. Koneru's Injury.

This Court can redress those Article III injuries by setting aside the SEC's unlawful enforcement action and requiring the SEC to dismiss the SDNY Action. The SEC focuses its redressability arguments only on Mr. Koneru's reputational injuries and makes no argument that his other injuries are not redressable. (Mot. 12–13.) Because Mr. Koneru has other redressable injuries, he has Article III standing.

Even as to the reputational injuries, however, the SEC gets it wrong. The SEC contends that only a victory on the merits would remedy Mr. Koneru's reputational harm. (Mot. 12–13.)[5] This contention errs: "[r]edress is possible in such a case because the damage to reputation is caused ***by the challenged action***," and "[a] declaratory judgment that the government's actions

---

[4] The SEC's arguments appear to be an attempt to smuggle the zone-of-interests test (which is not jurisdictional) into the Article III standing analysis. As discussed below, however, Mr. Koneru's lawsuit also satisfies the zone-of-interests test because his lawsuit will further the interest (Congress's power of the purse) that the Anti-Deficiency Act protects. *See* Part I.B, *infra*.

[5] The SEC invokes two cases in support of its contention that Mr. Koneru's reputational harm cannot be redressed by this Court (Mot. 12–13), but neither case supports that argument. *Henning v. Wachovia Mortgage, FSB*, 969 F. Supp. 2d 135 (D. Mass. 2013), was a mortgage dispute that involved neither the APA nor the ADA, and the SEC merely quoted the order's conclusion—which was untethered to any legal authority and not related to reputational harms stemming from unlawful enforcement actions. *Friedman v. Leavitt*, 2008 WL 9409136 (D.D.C. Dec. 5, 2008), an APA case where plaintiff failed to meet the exhaustion requirement for seeking administrative review, is even further afield. There are no administrative remedies available to Mr. Koneru because the SEC brought its enforcement action in federal court.

were unlawful will consequently provide meaningful relief." *Foretich*, 351 F.3d at 1214 (emphasis added).

**B. The SEC's "Zone of Interests" Arguments Do Not Detract from Mr. Koneru's Right To Sue.**

The SEC also errs in claiming that it may escape its Anti-Deficiency Act violation on the ground that Mr. Koneru's claims are not within the Anti-Deficiency Act's "'zone of interests.'" (Mot. 14 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)).) As the Supreme Court has explained, the zone-of-interests test "is not meant to be especially demanding" and should be applied "in keeping with Congress's 'evident intent' … to make agency action presumptively reviewable." *Patchak*, 567 U.S. at 225 (citations omitted). The zone-of-interests test therefore "do[es] not require any indication of congressional purpose to benefit the would-be plaintiff." *Id.* (citation omitted); *CSL Plasma Inc.*, 33 F.4th at 589 (same). Instead, "the salient consideration … is whether the challenger's interests are such that they 'in practice can be expected to police the interests that the statute protects.'" *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) (citations omitted); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998) ("This analysis focuses, not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects."). In applying this "lenient test, 'the benefit of any doubt goes to the plaintiff.'" *CSL Plasma Inc.*, 33 F.4th at 589 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)).

Mr. Koneru easily meets this "'lenient' test" because his lawsuit will "police the interests that the statute protects." *Amgen, Inc.*, 357 F.3d at 109 (citation omitted). The SEC admits that the relevant Anti-Deficiency Act interest is "protect[ing] Congress's power of the purse." (Mot. 14.) The SEC's suggestion that this lawsuit will not further that interest is incorrect. The lawsuit

protects Congress's power of the purse by ensuring that agencies cannot pursue run-of-the-mill non-emergency litigation during lapses in appropriations. The SEC's assertion that "Congress did not provide for a private cause of action" (*id.*) is irrelevant. It does not matter whether the Anti-Deficiency Act itself contains a private right of action. The APA provides that cause of action, which entitles anyone "'adversely affected or aggrieved by agency action within the meaning of a relevant statute … to judicial review.'" *FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025) (quoting 5 U.S.C. § 702). Courts interpret the phrase "'adversely affected' broadly, as covering anyone even '*arguably* within the zone of interests to be protected or regulated by the statute … in question.'" *Id.* at 232–33 (citation omitted). Further, "[a] plaintiff may sue under the APA unless her 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 233 (citation omitted); *see also Amgen, Inc.*, 357 F.3d at 109 (plaintiffs with "purely commercial interests" could allege agency violations of the Medicare Act, where their interests were "congruent with" and not "antagonistic to" the purpose of the statute).

The SEC's reliance on *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989), misunderstands that case. There, hazardous waste treatment firms alleged that the EPA violated the Resource Conservation and Recovery Act by publishing rules the firms viewed as too lenient. *Id.* at 920. The D.C. Circuit found the zone-of-interests test not met because (unlike Mr. Koneru's lawsuit here) these claims would have ***undermined*** the statute's purpose. Allowing the firms to insist on "even more demanding treatment requirements" risked undermining the environmental-rule balance Congress struck. *Id.* at 925. By contrast, there is no possibility here that Mr. Koneru's lawsuit somehow could be "fundamentally inconsistent with the interests Congress had in mind when it enacted" the Anti-Deficiency Act. *Id.* at 927.

The SEC's remaining arguments also fail. The SEC attacks Mr. Koneru's allegations regarding the SEC's arbitrary departures from its own Wells process (Mot. 15) but fails to explain how those background allegations detract from the alleged Anti-Deficiency Act violation: the SEC's filing of non-emergency litigation (the SDNY Action) during the shutdown. (*See* Compl. ¶¶ 24–36.) The SEC's quibbles with the Complaint's background narrative do not show how the violation Mr. Koneru alleges (filing of the SDNY Action) is inconsistent with the Anti-Deficiency Act's purposes (it is not). And while the SEC asserts that "the Complaint says nothing about any general harm that could result from the Commission viewing the Anti-Deficiency Act's exception more broadly than [Mr.] Koneru claims it should be interpreted" (Mot. 16), that also is irrelevant. It is not Mr. Koneru's pleading burden to allege normative harms from the SEC's Anti-Deficiency Act violation. It is enough that (i) the SEC violated the Anti-Deficiency Act, and (ii) the SEC's violation is inconsistent with the Anti-Deficiency Act's aim of protecting Congress's power of the purse. Mr. Koneru's lawsuit furthers that legislative purpose.

### C. The SEC's Decision To File a Lawsuit During the Shutdown Was a Final Agency Action.

The SEC is wrong in arguing that the decision to file the SDNY Action was not "final agency action." (Mot. 17–21.) The decision to file the SDNY Action was both "agency action" and a "final" agency action under Supreme Court precedent.

#### 1. The SEC's Decision To File the SDNY Action Was an "Agency Action."

The SEC errs at the outset by asserting that its decision to initiate the SDNY Action is not even "agency action" at all. (Mot. 17.) The SEC bases this argument on a misreading of the statutory definition of "agency action" under the APA, which defines "agency action" to mean "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

That argument is foreclosed by *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980). There, the Supreme Court held that issuing an internal agency administrative complaint was "agency action." *Id.* at 238 n.7. The Supreme Court explained that an "order"—one of the terms included within the definition of "agency action"—itself is defined to mean "the whole or a part of a final disposition … of an agency in a matter other than rule making." *Id.* (quoting 5 U.S.C. § 551(6)). The decision to issue a complaint is "'part of a final disposition' and therefore is 'agency action.'" *Id.* After examining the APA's intent, the Supreme Court observed that "[t]he term 'agency action'" is meant to "assure the complete coverage of every form of agency power, proceeding, action, or inaction." *Id.* (quoting S. Doc. No. 79-248, at 255 (1946)).

SEC's reliance on an out-of-circuit district court decision and a single-judge concurrence in a non-precedential out-of-circuit case cannot override on-point Supreme Court precedent. *See* Mot. 17–18 (citing *City of Oakland v. Holder*, 901 F. Supp. 2d 1188, 1195 (N.D. Cal. 2013); *Intra-Nat'l Home Care, LLC v. U.S. Dep't of Lab.*, 2024 WL 4100245, at *3 (3d Cir. Sept. 6, 2024) (Phipps, J., concurring)). *City of Oakland* addresses the meaning of "agency action" in one sentence without acknowledging *Standard Oil*'s analysis of the statutory text. 901 F. Supp. 2d at 1195. The unpublished concurring opinion in *Intra-National Home Care* suffers the same flaw. *See* 2024 WL 4100245, at *3.

### 2. The SEC's Decision To File the SDNY Action Was a "Final Agency Action."

The SEC's decision to file its complaint when it did was a "final" agency action. "As a general matter, two conditions must be satisfied for agency action to be 'final.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Id.* at 177–78 (citation omitted). "[S]econd, the action must be one by which 'rights or obligations have been determined,' or from which "legal consequences will flow."



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

*Id.* at 178 (citation omitted). Courts assess both criteria pragmatically. "[T]he law in this area is hardly crisp," and the D.C. Circuit therefore emphasizes the "'pragmatic' and 'flexible' nature of the inquiry as a whole." *Rhea Lana, Inc.*, 824 F.3d at 1027 (citation omitted).

The SEC's decision to file the SDNY Action during the lapse in appropriations meets both criteria for final agency action.

***First***, the filing of the SDNY Action was the consummation of the SEC's decisionmaking process. The decision to file a complaint in federal court literally is the final decision made within the SEC. Filing a complaint requires a decision by the Commissioners themselves, who act as the collective "head of the agency" for the SEC. (Compl. ¶¶ 57, 66); *see also* D. Fetterman, et al., *Defending Corps. & Indiv. in Gov't Investigations* § 7:89 (2025) (the filing of an enforcement action "must be authorized by the Commission … with a majority vote").) Any further decisions of binding force would be made by the court, as the litigation progresses—there is no more "agency[] decisionmaking" to be done. *Bennett*, 520 U.S. at 178.

The SEC theorizes that the decision to file may not be the consummation of the decisionmaking process because "[a]fter filing a complaint," the Commission may amend, dismiss, or settle that complaint. (Mot. 18.) This argument amounts to asserting that agency action is not final so long as the action can be changed. That assertion, however, would shield nearly any agency decision from judicial review and so Supreme Court and D.C. Circuit precedent rejects it: the possibility that a decision may be "revise[d] … is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *see also Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future. … 'The mere possibility that an agency might



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

reconsider … does not suffice to make an otherwise final agency action nonfinal.'" (citation omitted)); *Drs. for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 51 (D.D.C. 2025). Against this authority the SEC offers (Mot. 18) an unpublished out-of-circuit district court case—*Broadstreet, Inc. v. SEC*, 2025 WL 417933 (N.D. Tex. Feb. 6, 2025). The court there, however, did not hold that the mere possibility of amending a complaint renders the decision to file nonfinal, and the plaintiff did not even address finality in briefing. *Id.* at *2.

***Second***, the SEC's decision to violate the Anti-Deficiency Act by filing the SDNY Action also caused "legal consequences" to "flow." *Bennett*, 520 U.S. at 178 (citation omitted). There are immense practical consequences on account of that filing, including forcing Mr. Koneru to defend himself (on pain of default judgment) against an unlawful proceeding. Regardless, the SEC's argument that "no rights or obligations have been determined as a result of the … filing" ignores the facts alleged—and the SEC's own theory of the case. (Mot. 19 (citation omitted).)

The SEC's filing causes legal consequences not simply because it initiates legal proceedings, but also because (precisely because of its unlawful timing) the filing ***expands the universe of Mr. Koneru's liability*** and exposes him to potential penalties and disgorgement—"consequences" that make an agency action final and reviewable. *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016), is instructive. In *Hawkes*, the Supreme Court considered whether a U.S. Army Corps of Engineers' "jurisdictional determination" that a piece of property "contains waters of the United States" was a final agency action. *Id.* at 594–95. The Supreme Court rejected the argument that the determination was non-actionable, reasoning that it affected the owner's possible legal exposure for discharging pollutants on the land. As the Court explained, a determination stating that property does *not* contain waters of the United States binds the agency not to pursue civil enforcement action against the property owner for five years. *Id.* at 598–99.

The owner still may be sued for violations by a private citizen plaintiff, but "such a suit—unlike actions brought by the Government—cannot impose civil liability for wholly past violations." *Id.* "In other words, a negative JD [Jurisdictional Determination] both narrows the field of potential plaintiffs and ***limits the potential liability a landowner faces*** for discharging pollutants without a permit." *Id.* (emphasis added). Limiting potential liability "is a 'legal consequence[ ]' satisfying the second *Bennett* prong." *Id.* The Supreme Court also pointed to penalty exposure as another reason for finding final agency action. As the Court observed, an adverse determination "warns that if [the owner] discharge[s] pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties." *Id.* at 600.

Similarly, in *Sackett v. EPA*, 566 U.S. 120 (2012), the Supreme Court held that an "administrative compliance order" under the Clean Water Act was final agency action. The Court reasoned that "according to the Government's current litigating position, the order exposes the [plaintiffs] to double penalties in a[ny] future enforcement proceeding." *Id.* at 126. This was a "legal consequence." *Id.*

In line with the Supreme Court precedent, the D.C. Circuit has held that an action causes "legal consequences" where the action changes a person's penalty exposure. Even sending a letter is reviewable final agency action, where the letter provides a trigger for civil penalties. In *Rhea Lana Inc.*, for example, the D.C. Circuit considered whether an employer could challenge a Department of Labor letter warning the employer against employing "volunteer" workers. 824 F.3d at 1025. The employer argued "that, as a direct result of the notice provided to it by the Letter, the Department may treat its continued nonpayment of consignor-volunteers as a willful violation of the Department of Labor]'s regulations, thereby subjecting the company to civil penalties." *Id.* at 1029. The employer further argued that "exposure to civil penalties … constitutes a legal





PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

consequence that renders the Letter final agency action." *Id.* On both points, the D.C. Circuit "agree[d]." *Id.* By "render[ing] Rhea Lana a candidate for civil penalties," the letter "establishe[d] legal consequences" sufficient to support final agency action. *Id.* at 1032. Since *Rhea Lana Inc.*, the D.C. Circuit repeatedly has reached similar conclusions in cases considering agency actions that expand a party's potential legal liability. *See, e.g.*, *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021) (letter "extinguishing any willfulness defense" was final agency action); *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 957 (D.C. Cir. 2019) ("increased risk of prosecution and penalties" triggered by a CMS letter was a "'legal consequence' under *Bennett*").

These cases doom the SEC's "legal consequences" argument, where the SEC filed the SDNY Action when it did to broaden Mr. Koneru's legal exposure. As the SEC's own brief admits, the agency filed the SDNY Action when it did so that it could "seek disgorgement and civil penalties." (Mot. 1; *see also* Compl. ¶¶ 74–75 (discussing disgorgement and penalties).) The SEC asserts its purported interest in disgorgement and penalties on over a dozen pages. (Mot. 1, 7, 28, 29, 30, 31, 32, 33, 34, 36, 39, 40, 43 (admitting, *e.g.*, that "the Commission acted to protect its ability to seek monetary penalties and disgorgement").) The SEC cannot argue seriously that there are no "legal consequences" to its decision to file during the shutdown (*see* Mot. 19–20) when the rest of its brief argues that the SEC took that action precisely so it could impose these additional (and considerable) legal consequences on Mr. Koneru. Because following the law and filing after the shutdown ended would have "limit[ed] the potential liability" Mr. Koneru "face[d]," *Hawkes*, 578 U.S. at 598–99, and because the timing of the SDNY Action was intended to cause "exposure to civil penalties," *Rhea Lana, Inc.*, 824 F.3d at 1029, the SEC's decision to file the SDNY Action when it did is reviewable final agency action.

Invoking a smattering of out-of-circuit cases, the SEC argues for a sweeping, per-se rule that filing an enforcement action never can be reviewable. (*See* Mot. 18–21 & n.14 (collecting cases).) The SEC's cited cases do not support any such rule. Some did not consider "direct action against Plaintiffs" (such as an enforcement action) at all. *See, e.g.*, *Mann v. SEC*, 2025 WL 2779255, at *2 (E.D. La. Sept. 30, 2025). Others considered only agency administrative complaints, not federal lawsuits. *See, e.g.*, *LabMD, Inc. v. FTC*, 776 F.3d 1275, 1277–78 (11th Cir. 2015) (considering only administrative enforcement action). Administrative proceedings differ from federal lawsuits as to *Bennett*'s first prong: the former are not the "consummation of the agency's decisionmaking process," 520 U.S. at 177–78 (citation omitted), because there remains work to be done within the agency itself. Thus, for example, *American Financial Benefits Center v. FTC*, 2018 WL 3203391 (N.D. Cal. May 29, 2018), observed that an internal administrative complaint is only "a prerequisite to a definitive agency position on the question whether [the company] violated the Act," not a final decision. *See id.* at *7 (citation omitted). That is not the case for lawsuits filed in federal court where no further internal agency decision is required.

The SEC's reliance on *Buntrock v. SEC*, 347 F.3d at 995, proves the point. There, the Seventh Circuit observed that "the SEC in this case did not issue an administrative complaint, that is, a complaint that kicks off a proceeding before the agency." *Id.* at 998 (emphasis omitted). Because the SEC instead "filed a suit in federal court, which it turned over to its lawyers to prosecute," "[t]he administrative phase has ended." *Id.*

Other cases on which the SEC relies had no occasion to consider the "legal consequences" at issue here. *Standard Oil* is typical. As described above, *Standard Oil* rejects the SEC's argument that filing a complaint is not "agency action" at all. *See* Part I.A.1, *supra*. *Standard Oil*



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

nevertheless found that the "agency action" there (an administrative, not federal-court, complaint) was not "final" because the plaintiff had not pointed to consequences beyond "the expense and annoyance of litigation." 499 U.S. at 244 (citation omitted). Mr. Koneru's case, however, could not be more different. Mr. Koneru expressly alleges that the SEC's Anti-Deficiency Act violation cannot be justified by statutes of limitations the agency knew about for years (*see* Compl. ¶¶ 74–75), and the SEC admits it filed the SDNY Action when it did precisely to avoid the legal consequences of those statutes of limitations. (*See* Mot. 1, 7, 28, 29, 30, 31, 32, 33, 34, 36, 39, 40, 43; *see also Rhea Lana, Inc.*, 824 F.3d at 1029 n.2 (change in statute of limitations for willful claims was another "legal consequence").) Had the SEC followed the law (and filed its complaint, if at all, only after the shutdown), the litigation would involve more limited exposure. That is a "legal consequence" satisfying *Bennett*'s second prong and distinguishing the decisions the SEC relies on. *Hawkes*, 578 U.S. at 598–99.

Although the above is enough to reject the SEC's arguments, the SEC ignores additional D.C. Circuit authority confirming that its decision to file the SDNY Action during the shutdown was "final." In *Athlone Industries, Inc. v. Consumer Product Safety Commission*, 707 F.2d 1485 (D.C. Cir. 1983), the D.C. Circuit held that filing an agency administrative complaint could be final agency action where the filing amounted to "a final determination that such proceedings were within [the agency's] statutory jurisdiction." *Id.* at 1489 n.30. Similarly here, the SEC's filing when it did was a final decision that the SEC did not believe the Anti-Deficiency Act applied. Beyond that, in *AT&T Co. v. EEOC*, 270 F.3d 973 (D.C. Cir. 2001), the D.C. Circuit stated in dicta that "***there clearly would be final agency action if the Commission filed a lawsuit against AT&T***." *Id.* at 975 (emphasis added).[6]

[6] The D.C. Circuit went on to suggest that in the hypothetical scenario discussed in that case, "the Company could not challenge that decision as final agency action under the APA; it would instead



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

The D.C. Circuit's common-sense observation in *AT&T* accords with what analysis of *Bennett*'s two prongs confirms: the SEC's decision to file a federal lawsuit during the shutdown was "final agency action" under the APA.

**D. The Anti-Deficiency Act Does Not Override the Strong Presumption in Favor of Judicial Review.**

The SEC also is wrong in claiming that the Anti-Deficiency Act itself "precludes" review of final agency action under the APA. (Mot. 21–23.) The SEC admits that the APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,'" but then asserts that statutes may "withdraw[]" that cause of action where they "provide[] a detailed mechanism for judicial consideration of particular issues at the behest of particular persons." (*Id.* at 21 (citations omitted).)

The SEC faces a steep and "uphill battle" on this argument. *Neguse v. ICE*, --- F. Supp. 3d ---, 2025 WL 3653597, at *22 (D.D.C. Dec. 17, 2025). "'Congress rarely intends to prevent courts from enforcing its directives to federal agencies.'" *Id.* (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)). There is a "'strong presumption' favoring judicial review of administrative action," and so it is the SEC's "heavy burden" to show that specific statutory language and structure prohibit review of the agency's compliance with a legislative mandate." *Id.* (citation omitted).

The SEC cannot carry that heavy burden here. The SEC asserts that the Anti-Deficiency Act provides internal, Executive Branch review—if an agency violates the statute, "the agency head must report the violation," and "Congress or individual agencies can … ask the Comptroller

simply defend itself against the suit," *AT&T*, 270 F.3d at 975—the unstated reasoning likely being that in most run-of-the-mill cases, defending the agency's lawsuit is an adequate remedy under the APA. As discussed below, however, here defending the SDNY Action is not an adequate remedy. *See* Part I.E, *infra*.

General to render an opinion." (Mot. 22.) The SEC omits, however, that this "limited scheme" relates only to "internal compliance" and depends entirely on willing, lawful behavior of the Executive Branch. *Neguse*, 2025 WL 3653597, at *24. "The ADA provides no avenue for relief when an Executive Branch agency has decided as a matter of policy, as is the alleged case here, that its actions do not represent a violation of an appropriations bar." *Id.* Adopting the SEC's position would make the Anti-Deficiency Act essentially voluntary and would override the APA's general cause of action on the theory that executive agencies and presidential administrations can be expected to interpret and follow their obligations accurately and lawfully—a theory contrary to the existence of the APA itself.

The SEC cites no cases holding that purely internal review mechanisms are enough to withdraw the APA's general cause of action. The primary authority upon which the SEC relies is not such a case. (Mot. 22 (citing *Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025)).) *Global Health* concerned a different statute, the Impoundment Control Act. 153 F.4th at 8. Importantly, however, the Impoundment Control Act ***did*** provide a non-Executive Branch means of judicial enforcement. That statute provided a private right of action to Congress allowing Congress to sue via "a specified legislative branch official." *Id.* at 18. The Impoundment Control Act's mechanisms therefore did not leave enforcement up to the Executive Branch's good graces. *See id.* "This distinguishes the [Anti-Deficiency Act] from the Impoundment Control Act" and confirms that the Anti-Deficiency Act's internal review processes are not enough to rebut the presumption of judicial review. *Neguse*, 2025 WL 3653597, at *24.

If Congress wanted to eliminate review of Anti-Deficiency Act violations under the APA, Congress could have done so. Adopting the SEC's position would undermine Congress's power of the purse in the face of lawless executive agencies and run contrary to other decisions permitting



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

injured parties to enjoin agency Anti-Deficiency Act violations. *See Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004, 1032 (N.D. Cal. 2025) ("The Court finds plaintiffs have properly framed their claims [alleging violations of the Anti-Deficiency Act] under the APA and that the APA clearly provides a cause of action to challenge agency conduct such as what is alleged here."). The SEC, in the end, falls short of justifying that unusual result.

**E. Mr. Koneru Has No Adequate Remedy in the SDNY Action.**

SEC's argument that Mr. Koneru "has an adequate remedy in the Enforcement Action" (Mot. 24) is unavailing. Mr. Koneru does not have an adequate remedy because "the SEC's filing of the SDNY Action itself is the legal wrong," and "the SDNY Action would not exist if the SEC had followed the law." (Compl. ¶¶ 88.c.) "In order to remedy that wrong in the SDNY Action, Mr. Koneru would be forced to proceed as though the SDNY Action were valid, effectively denying him redress for that wrong." (*Id.*)

The Supreme Court and this Court recognize similar "here-and-now injur[ies]" from "subjection to an illegitimate proceeding." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (internal quotation marks and citations omitted); *see also Avila v. NLRB*, 2025 WL 859223, at *6 (D.D.C. Mar. 19, 2025). In *Axon*, the Supreme Court considered whether federal courts had jurisdiction over a lawsuit seeking to enjoin FTC administrative enforcement proceedings, where the FTC's administrative law judges purportedly benefited from unconstitutional protections from removal. 598 U.S. at 182. The Supreme Court held that the FTC Act did not deprive federal district courts of jurisdiction to hear collateral challenges to the FTC's enforcement proceedings, where forcing the plaintiff to raise arguments in those enforcement proceedings effectively would "foreclose all meaningful judicial review" of the plaintiff's claim. *Id.* at 190. The plaintiff's claim

turned on "subjection to an illegitimate proceeding." *Id.* at 191 (citation omitted). To have an opportunity for "meaningful review" of that claim, the plaintiff needed to be permitted to bring a separate suit: "[a] proceeding that has already happened cannot be undone." *Id.*

Similar injuries occur in the qualified immunity context—"[b]ecause qualified immunity is "an immunity from suit rather than a mere defense to liability … it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). An injury caused by an unlawful proceeding, in other words, cannot be remedied by raising that injury in the very proceeding causing it. *See also, e.g.*, *Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 985 (2d Cir. 1997) (forced arbitration of inarbitrable claims constitutes irreparable harm).

The same logic applies even more forcefully here. As in *Axon*, Mr. Koneru alleges a "here-and-now injury" of being forced to participate in an "illegitimate proceeding." 598 U.S. at 175. Mr. Koneru should not be required to litigate in SDNY, where no SDNY Action currently should exist in the first place.[7] And unlike cases addressing unconstitutional removal protections, here there is no question whether Mr. Koneru's harm merits "prospective rather than retrospective relief." *SEC v. Musk*, 2026 WL 279790, at *17 (D.D.C. Feb. 3, 2026) (citation omitted). In the removal context, the question of what remedy should apply often is debated because "the unlawfulness of [a] removal provision does not strip [an agency head] of the power to undertake the other responsibilities of his office." *Id.* at *17. Here, by contrast, the SEC had no power to file the SDNY Action when it did. That action was unlawful from the beginning. The SEC's assertion that Mr. Koneru somehow has an "adequate remedy" in the very unlawful proceeding

---

[7] Even if SEC were to re-file new charges against Mr. Koneru now that the lapse in appropriations has ended, Mr. Koneru at most should be required to litigate in that new lawful case, not the current unlawful one.

the SEC initiated is a non-sequitur.[8]

Mr. Koneru also lacks an adequate remedy at law for another reason: he cannot bring counterclaims against the SEC in the SDNY Action. *See* 15 U.S.C. § 78u(g). Mr. Koneru could not seek affirmative injunctive relief and otherwise could not prosecute his Anti-Deficiency Act claims to their fullest extent if the SEC's Anti-Deficiency Act violation were relegated to an affirmative defense.[9]

## II. MR. KONERU ADEQUATELY ALLEGES A VIOLATION OF THE ANTI-DEFICIENCY ACT.

Once the Court rejects each of the SEC's procedural defenses, the Court should have no trouble concluding Mr. Koneru has stated a claim on the merits. The Anti-Deficiency Act forbids

[8] *NAACP v. Meese*, 615 F. Supp. 200 (D.D.C. 1985), *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684 (D.C. Cir. 2015), and similar cases (Mot. 24–25 & n. 18) are distinguishable for this reason. In *Meese*, there was no allegation or suggestion that the agency lacked capacity to bring the pending litigation that the court held offered an adequate remedy. *See Meese*, 615 F. Supp. at 203. *Morgan Drexen* was not even an APA case; the plaintiff brought a constitutional challenge seeking a permanent injunction against a later-filed CFPB enforcement action. *See Morgan Drexen*, 785 F.3d at 694. The plaintiff conceded that "waiting for a decision from the district court" caused no irreparable injury and identified no inconvenience in litigating an equivalent defense there. *See id.* at 695. Those concessions contrast sharply with Mr. Koneru's allegations of irreparable injury from an illegally filed action in an improper venue. *See* Part I.A, *supra*.

[9] The SEC's reliance on *Buntrock*, 347 F.3d at 995 (Mot. 24), again is misplaced. *Buntrock* rejected an APA challenge based on the SEC's violation of conflict-of-interest regulations. *See* 347 F.3d at 997; *see also Buntrock v. SEC*, 2003 WL 260681, at *3 (N.D. Ill. Feb. 6, 2003) (district court opinion). The district court held, and the Seventh Circuit agreed, that the APA provided no jurisdiction because the "SEC's ethical regulation does little to limit the discretion of the SEC in deciding to initiate enforcement actions." 2003 WL 260681, at *3; *see* 5 U.S.C. § 701(a)(2) (barring APA claim where "agency action is committed to agency discretion by law"). Here, however, the Anti-Deficiency Act gives the SEC absolutely ***no discretion*** to bring a non-emergency enforcement action during a government shutdown and therefore the APA provides jurisdiction to challenge the unlawful action. And unlike in *Buntrock*, where the plaintiff's allegations of investigative misconduct gave rise to mere defenses, the SEC's violations here give rise to claims that Mr. Koneru cannot bring as counterclaims in the SDNY Action.

any "officer or employee of the United States Government" from "employ[ing] personal services exceeding that authorized by law" unless those services fall into a narrow exception: "emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342. "As used in this section, the term 'emergencies involving the safety of human life or the protection of property' does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property." *Id.*

Congress created this narrow exception to allow agencies to take necessary action to address clear and tangible threats to the public. The exception has two critical criteria: (1) there must be a threat to "protection of property," and (2) that threat must constitute an "emergenc[y]." The SEC cannot show that its litigation filing five years into its investigation satisfies either criterion.

### A. The SEC's Routine Litigation Was Not Necessary for "the Protection of Property."

The SEC cannot establish that filing the SDNY Action in the middle of the shutdown was necessary for the "protection of property" here. 31 U.S.C. § 1342. In determining what "protection of property" means for the purposes of this statute, the Court should consider "the plain meaning of the text, looking to the language itself" and "the specific context in which that language is used." *Blackman v. Dist. of Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) (citation omitted).

Context confirms that "protection of property" here refers to necessary actions in response to emergencies posing a tangible threat to the public: either "the safety of human life" or the "protection of property." 31 U.S.C. § 1342.

Basic canons of construction reinforce that plain meaning. In determining what "protection of property" means for purposes of this statute, the Court should be guided by the "commonsense canon of *noscitur a sociis*," *United States v. Williams*, 553 U.S. 285, 294 (2008), meaning that "a

word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). Statutory terms therefore are "narrowed" and "given more precise content by the neighboring words with which [they] [are] associated." *Williams*, 553 U.S. at 294; *see also United States v. Tobin*, 480 F.3d 53, 57–58 (1st Cir. 2007) (statutory term should have "same meaning as companion terms" and "[p]resumptively, subsections … should be read together"). The Court also should consider the related canon *ejusdem generis*, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003). And, in a similar vein, where "a general statement of policy is qualified by an exception," courts are to "read the exception narrowly in order to preserve the primary operation of the provision." *Comm'r. v. Clark*, 489 U.S. 726, 739 (1989). Doubts should be resolved in favor of the rule, not the exception—"[e]xceptions ought not operate to the farthest reach of their linguistic possibilities if that result would contravene the statutory design." *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 63 (D.D.C. 2020) (quoting *Maracich v. Spears*, 570 U.S. 48, 60 (2013)).

Here, where "the protection of property" appears parallel to "***the safety of human life***" in a narrow statutory exception, and Congress did not define either phrase, the correct inference is that Congress intended the plain and ordinary meaning of "property": tangible property of a sort likely to be "threatened" (*i.e.*, put at risk of "evil, injury, or damage," Threat, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/threat (last visited Mar. 17, 2026))

and requiring "protection" in "emergencies," such as disasters impacting human life or similar threats to public health and safety. *See, e.g.,* 3 Comp. Gen. 979 (1924) (discussing "fire-fighting assistance" in response to a "fire threatening the existence of a large part of the Fort Totten Indian School Plant"); *Gov't Operations in the Event of a Lapse in Appropriations*, 1995 WL 17216091, at *7 n.6 (O.L.C. Aug. 16, 1995) (providing, as examples of emergencies under related appropriations statute: FBI criminal investigations, legal services rendered by the Department of Agriculture in connection with state meat inspection programs and enforcement of the Wholesome Meat Act of 1967, 21 U.S.C. §§ 601–695, the protection of commodity inventories by the Commodity Credit Corporation, and the investigation of aircraft accidents by the National Transportation Safety Board). In other words, Congress intended the Anti-Deficiency Act's narrow exception to permit the protection of property when emergencies pose a clear and tangible threat, as those terms ordinarily are used and understood. There is no indication that Congress intended to employ a broad or technical meaning allowing agencies to act to preserve any conceivable type of interest or claim related to property, no matter how intangible or abstract. *See EPA v. Calumet Shreveport Ref., LLC*, 145 S. Ct. 1735, 1750 (2025) (applying plain meaning where statute did not define term).

The SEC argues for a broader view of "protection of property" but in doing so ignores the statutory context discussed above and stretches "protection of property" beyond recognition. The SEC asserts that "the safety of human life or the protection of property" embraces not only "property" of the sort threatened in emergencies or catastrophes threatening "human life," 31 U.S.C. § 1342, but also the following abstract and technical supposed interests in property: "(1) the right to bring a lawsuit against Koneru, and (2) the potential monetary remedies available from the lawsuit." (Mot. 29.) The first purported interest, however, is not at issue. There is no dispute

that had the SEC waited until after the shutdown ended to sue Mr. Koneru, the SEC still could have "br[ought] a lawsuit." Only the "remedies" for certain claims in that lawsuit would have been affected. The SEC's argument therefore boils down to the theory that "property" for Anti-Deficiency Act purposes includes unalleged requests for two specific types of relief: (1) equitable disgorgement, and (2) punitive civil penalties. (*See id.* 28.)

The SEC cannot show that "protection of property" embraces these abstract and unalleged interests given the context in which that phrase appears. Plain meaning, multiple canons of construction, and common sense militate against interpreting "protection of property" to mean "preservation of unproven litigation claims to punitive relief in a securities lawsuit." And while the above is enough to reject the SEC's interpretation, that interpretation also is fatally flawed for three additional reasons:

***First***, had Congress meant "property" in this context to embrace any claim or intangible property interest, Congress could have said so. Congress could have created an exception for "protection of claims," "protection of property interests," or "preservation of remedies in litigation," rather than the plain-English phrase "protection of property." If Congress had wanted the exception to be broader, "it could easily have used expansive language." *Indep. Bankers Ass'n of Am. v. Farm Credit Admin.*, 164 F.3d 661, 667 (D.C. Cir. 1999).

Congress, in fact, regularly specifies when a statute should broadly be interpreted to embrace "interests" or "claims" in addition to property as that term is understood in common usage. In the RICO statutes, for example, Congress distinguished "property" in an enterprise from "any … interest in" or "claim against" that enterprise. *See* 18 U.S.C. § 1963. In the Bankruptcy Code, and consistent with the policy aims of bankruptcy, Congress broadly declared that "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement

of the case." 11 U.S.C. § 541(a)(1). In the criminal-forfeiture statutes, Congress broadly stated that forfeiture could reach "interest[s] in, claims against, and property or contractual rights affording a source of control over, [a] continuing criminal enterprise." 21 U.S.C. § 853. Similar examples are legion. *See, e.g.*, 50 U.S.C. § 4329 ("The President, or such officer or agency as he may designate, may return any property ***or interest*** vested in or transferred to the Alien Property Custodian.") (emphasis added); 42 U.S.C. § 18752 (addressing "property interests relating to federally funded advanced nuclear reactor projects," and defining "property interest" broadly to mean "any interest in real property or personal property," but clarifying that "[t]he term 'property interest' does not include" certain types of intellectual property); 22 U.S.C. § 1643b (requiring that a commission determine "the amount and validity of claims by nationals of the United States against the Government of Cuba, or the Chinese Communist regime," considering "measures directed against, property including ***any rights or interests therein***") (emphasis added).

Congress, in other words, is capable of broadly defining "property" to include unfiled litigation "claims" or abstract intangible "interests" when it means to. Especially where the Anti-Deficiency Act's exception must be construed narrowly, Congress's choice ***not*** to use such broad language here must be given effect: "A traditional presumption of statutory interpretation, however, is that when Congress 'employs different words, it usually means different things." *Cook v. Trump*, 804 F. Supp. 3d 14, 27 (D.D.C. 2025) (citation omitted).

***Second***, the SEC's reliance on the common-law property interest in a "chose in action" cannot change that result. (Mot. 28.) "Protection of property" is not understood to mean "protection of a chose in action" in ordinary usage. The Court should not read the Anti-Deficiency Act's plain language to include a "specialized common law meaning when Congress hasn't itself invoked the common law terms of art associated with that meaning." *Food Mktg. Inst. v. Argus*

*Leader Media*, 588 U.S. 427, 428 (2019).

Even setting aside that Congress did not contemplate protecting these interests, there are two more problems with the chose-in-action theory. (1) It is doubtful that a "chose in action" reaches unfiled claims. "In general, a claim must have been asserted or commenced in order to be recognized as a chose in action." *Powell-Ferri v. Ferri*, 326 Conn. 457, 474–75 (2017). (2) It is even more doubtful that a "chose in action" reaches the specific monetary remedies at issue here. The SEC's own citations show that a chose in action is "a legal claim for money, or a contractual right." *Sprint Comm. Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008). The key word is "legal." Choses in action appear to have been associated with "legal" rather than equitable rights, such as obligations between creditors and debtors. *See In re Halpin*, 566 F.3d 286, 290 (2d Cir. 2009) ("[T]he terms 'choses in actions' and 'debts' are used by courts to represent the same thing when viewed from opposite sides. The chose in action is the right of the creditor to be paid, while the debt is the obligation of the debtor to pay."). Although the assignee of a "chose in action" would receive "equitable … title" to the claim, *Sprint Comm.*, 554 U.S. at 276, the SEC cites nothing showing that a "chose in action" itself could be based upon the types of equitable and punitive remedies the SEC seeks here.

The theory that the SEC has a "property" interest in equitable disgorgement and civil penalties makes no sense given the nature of those claims. Disgorgement, to begin, is an equitable remedy, *Liu v. SEC*, 591 U.S. 71, 79 (2020), and therefore is a remedy within a court's discretion, *United States v. Project on Gov't Oversight*, 572 F. Supp. 2d 73, 77 (D.D.C. 2008). The SEC cannot claim it has a "property" right in a purely discretionary remedy. *See, e.g., Ordonez Orozco v. Chertoff*, 2008 WL 5155728, at *4 (S.D. Tex. Dec. 8, 2008) ("The failure to receive relief that is purely discretionary in nature does not amount to a deprivation of a liberty or property interest.")



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

(collecting cases). Disgorgement also is punitive in nature. Because disgorgement often is noncompensatory as "it is applied in SEC enforcement proceedings," it "operates as a penalty." *Kokesh v. SEC*, 581 U.S. 455, 465, 467 (2017). And civil penalties are "a punitive remedy." *SEC v. Jarkesy*, 603 U.S. 109, 134 (2024). It begs credulity to argue the SEC has a property interest in punishing individuals. The SEC cites nothing for the novel theory that the government has a "property" interest in punishment.

***Third***, the SEC's asserted interest in claims for discretionary equitable and punitive remedies is woefully abstract even when compared to the matter upon which it relies that involved a "security interest." (*See* Mot. 30–31 (citing *Matter of: U.S. Dept. of Ag. – Operations of the Farm Services Agency During the Fiscal Year 2019 Lapse in Appropriations*, B-331092, 2020 WL 3501349 (June 29, 2020)).) The cited Comptroller General opinion, importantly, concerned security interests in ***actual property***, not a hypothetical lawsuit. 2020 WL 3501349, at *5. Unlike damages in a civil lawsuit, which are far from guaranteed, a security interest establishes priority over other creditors or lienholders who may have competing claims to the same property. *See In re Fair Fin. Co.*, 13 F.4th 547, 554 (6th Cir. 2021). In other words, a security interest is a long-recognized property interest that already has been established and made enforceable against third parties. It requires no factfinding or court order to establish its existence or value.

***Fourth***, the SEC's argument that "there is a public interest in preventing and punishing securities fraud" (Mot. 32) cannot justify interpreting "protection of property" to mean preserving remedies for unproven, non-scienter-based claims. The SEC's argument sweeps too broadly: essentially all government activity relates to the "public interest." If an agency could escape the Anti-Deficiency Act merely whenever the "public interest" purportedly is threatened, the Anti-Deficiency Act would have no force at all.



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

The SEC, moreover, did not file the SDNY Action to preserve remedies for "securities fraud." The SEC instead brought the SDNY Action in part to preserve disgorgement remedies for conduct not involving scienter—***i.e., alleged conduct that was not fraudulent***. The statute of limitations for disgorgement as a remedy for truly fraudulent conduct (involving scienter) is ten years. 15 U.S.C. § 78u(d)(8)(A)(ii). Had the SEC lawfully waited until after the shutdown ended to bring the SDNY Action, the SEC still could have sought disgorgement remedies for scienter-based claims (assuming it could prove scienter). *Id.* And the SEC also remains free to pursue other equitable remedies (such as an officer-director bar) regardless of scienter. See 15 U.S.C. § 78u(d)(8)(B).

The SEC's continuing right to bring a lawsuit also shows why *Matter of: U.S. Department of Agriculture* cuts against the SEC's interpretation of "protection of property." In that opinion, the Comptroller General concluded that the Farm Services Agency's issuance of warehouse receipts to cotton producers was a violation of the Anti-Deficiency Act. 2020 WL 3501349, at *8. The Comptroller explained that although a delay in issuing warehouse receipts could reduce the cotton's market value, that delay did not "immediately threaten" the cotton. *Id.* Similarly here, the SEC's ability to bring a lawsuit would have continued to exist had the SEC followed the law. The SEC does not and cannot assert that all claims would have been time-barred. Only the value of the SEC's ability to levy punitive remedies would have been threatened. Even if the *value of* the SEC's potential recovery in any enforcement action might have been reduced, however, there is no argument that following the law would have caused the SEC to forfeit the enforcement action entirely.

### B. The SEC's Routine Litigation Filing Five Years into Its Investigation of a Retired Executive Was Not an "Emergency."

The SEC also does not establish that any threat to "protection of property" here arose from



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

any true "emergency." There were no exigent circumstances that posed a threat to the public. The five-year statute of limitations remained the same from the day the SEC began its investigation to the present day. The SEC could have brought the SDNY Action at any point during those five years. Even if "protection of property" somehow embraced the abstract interests the SEC asserts, the SEC cannot show that "protection" was necessary because of an "emergency," as opposed to a circumstance of the SEC's own making.

The term "emergency" must be construed narrowly according to the same canons of construction discussed above, *see* Part II.A, *supra* (citing *Comm'r v. Clark*, 489 U.S. at 739), and should be read to mean emergencies posing threats to "protection of property" and "the safety of human life." 31 U.S.C. § 1342. This context supports reading "emergency" to reach only emergent tangible threats (*e.g.*, wars, pandemics, fire, hurricanes, other natural disasters, and violent crime) to the public writ large. There is no support in the statute, by contrast, for reading "emergency" to include mere litigation deadlines related to non-scienter-based conduct, especially where those deadlines were foreseeable long in advance.

Plain meaning reinforces the view that foreseeable deadlines do not present an "emergency" within the meaning of the Anti-Deficiency Act's narrow exception. "Where Congress does not furnish a definition of its own," courts "generally seek to afford a statutory term its ordinary or 'natural meaning.'" *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) (citations omitted); *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) ("'[I]t's a fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary … meaning … at the time Congress enacted the statute.'") (citations omitted). Here, an "emergency" means "an unforeseen combination of circumstances or the resulting state that calls for immediate action." Emergency, Merriam-Webster.com,

https://www.merriam-webster.com/dictionary/emergency (last visited Mar. 17, 2026); *see also, e.g.*, Emergency, American Heritage Dictionary, Houghton Mifflin Co. (2d Coll. ed. 1982) ("An unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate action."); Emergency (4.a.i), Oxford English Dictionary, Oxford Univ. Press (Dec. 2024) ("A juncture that arises or 'turns up'; esp. a state of things unexpectedly arising, and urgently demanding immediate action."); Emergency, Black's Law Dictionary (12th ed. 2024) ("A sudden and serious event or an unforeseen change in circumstances that calls for immediate action.").

Each of these definitions has in common the components of an "unforeseen" or "sudden" event that is "serious"—factors absent here. In other words, as alleged, "[c]ommon to all these definitions are requirements that the emergency be ***urgent*** and arise from circumstances that are ***sudden*** or ***unforeseen***." (Compl. ¶ 40.) The SEC quibbles with these definitions, asserting, *e.g.*, that Merriam-Webster's Dictionary also (as a secondary definition) defines "emergency" to mean an "urgent need for assistance or relief." (Mot. 37.) Even this secondary definition, however, is accompanied by example usage suggesting unforeseen and grave circumstances, *e.g.*, "the mayor declared a state of emergency after the ***flood***." *See* Emergency, Merriam-Webster.com (emphasis added).

Courts across jurisdictions have agreed for decades that "emergency" commonly means a sudden or unexpected circumstance: "emergency" means "a state of things unexpectedly arising, and urgently demanding immediate attention." *Acuity Ins. Co. v. McDonald's Towing & Rescue, Inc.*, 747 F. App'x 377, 381 (6th Cir. 2018); *see also, e.g.*, *Kozup v. Georgetown Univ.*, 906 F.2d 783, at *2 (D.C. Cir. 1990) (unpublished) (jury instructions defining emergency as "sudden, urgent, unexpected or unforeseen serious happening[s] demanding immediate action"); *Payne v. City of*

*Houston*, 2025 WL 999085, at *5 (5th Cir. Apr. 3, 2025) ("unforeseen circumstances that call for emergency action") (citations omitted).[10]

The Court should apply that common and ordinary meaning and hold that the SEC has not shown an "emergency" requiring "protect[ing]" anything at this early stage. Mr. Koneru pleads facts showing there was no emergency: Mr. Koneru poses no threat (imminent or otherwise) to human life or property where he is a retired executive living abroad with no role at any public company. (Compl. ¶ 44.) Even if that threat could exist, it would not be "urgent" given that the SEC took nearly five years to investigate Mr. Koneru. (*Id.* ¶ 45; *see also id.* ¶¶ 20–23 (describing investigative activities years ago, and all productions completed years or months before the shutdown).) And both the potential expiration of the statute of limitations and the shutdown were foreseeable well in advance. (*Id.* ¶¶ 44–47.) Any "emergency" created by these circumstances was of the SEC's own making given that the SEC could have avoided this problem simply by suing earlier.

---

[10] *See also, e.g.*, *Farm Bureau Gen. Ins. Co. of Mich. v. Schneider Nat'l Carriers, Inc.*, 2023 WL 4108494, at *8 (S.D. Ohio June 21, 2023) (defining "emergency" under Ohio's good Samaritan law as "an ***unforeseen combination of circumstances*** or the resulting state that calls for immediate action") (emphasis added) (citation omitted); *Marshall v. Pasadena Unif. Sch. Dist.,* 15 Cal. Rptr. 3d 344, 354 (Cal. App. 2004), *as modified on denial of reh'g* (July 28, 2004) (defining emergency for when California schools may enter into contracts without soliciting bids as "***a sudden, unexpected occurrence*** that poses a clear and imminent danger, requiring immediate action to prevent or mitigate the loss or impairment of life, health, property, or essential public services") (emphasis added) (citation omitted); *Nagel v. Gerald Dennen & Co.*, 650 N.E.2d 547, 550 (Ill. App. 1995) (defining emergency when considering what constitutes an emergency motion as a "***sudden unexpected happening; an unforeseen occurrence*** or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity") (emphasis added) (citation omitted); *Scaccia v. Borough of Old Forge*, 373 Pa. 161, 163 (1953) (in determining whether a burgess could appoint special policemen during an emergency, defining emergency as "***a sudden or unexpected event*** which creates a temporarily dangerous condition usually necessitating immediate or quick action") (emphasis added); *Cont. Cartage Co. v. Morris*, 59 F.2d 437, 446 (E.D. Ill. 1932) (defining "emergency" as its "plain, ordinary signification" meaning "a pressing necessity; an ***unforeseen occurrence*** or combination of circumstances which calls for immediate action or remedy") (emphasis added).



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

This alone is reason enough to reject the SEC's "emergency" arguments, where true "emergency situations … cannot arise as a result of the agency's own delay." *Wash. Alliance of Tech. Workers*, 202 F. Supp. 3d at 26 (citing *Envtl. Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920–21 (D.C. Cir. 1983)). In the notice-and-comment context, for example, the D.C. Circuit and courts in this District hold that an "emergency" necessary to avoid certain rulemaking requirements cannot result from an agency's own "wait[ing] until the eve of a statutory, judicial, or administrative deadline." *Purdue Univ. v. Scalia*, 2020 WL 7340156, at *7 (D.D.C. Dec. 14, 2020) (citation omitted); *see also Envtl. Def. Fund*, 716 F.2d at 920–21. The SEC cites no case holding that the potential expiration of a statute of limitations is an "emergency." The opposite is true: "[g]enerally, the fact that the statute of limitations will soon bar claims does not constitute an emergency." *See, e.g.*, *Davis v. Unitel Voice, LLC*, 2021 WL 1158178, at *3 (D.N.J. Mar. 18, 2021).

The SEC's remaining arguments similarly are unavailing. At most, they raise dubious fact issues that cannot be resolved at this stage. They do not show that the SEC was entitled to the safe harbor of the emergency exception as a matter of law.

***First***, the SEC's reliance on a 1950 statutory revision deleting the word "sudden" from the statute (Mot. 38) is misplaced. To start, the statutory text remains unambiguous. The plain meaning of "emergency" related to "protection of property" cannot encompass the SEC's self-created statute-of-limitations problem, and so the Court need not (and should not) consider legislative history. "[W]here the text is unambiguous, as it is here, courts may not look to history." *Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 791 (D.C. Cir. 2018).

Regardless, the deletion is less probative than the SEC asserts. Congress sometimes deletes words from statutes simply because they are superfluous. *See, e.g.*, *Bunge Corp. v. United States*, 5 Cl. Ct. 511, 516 n.2 (1984), *aff'd*, 765 F.2d 162 (Fed. Cir. 1985) ("That deletion occurred because



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

Congress deemed the language superfluous, as indeed it was."). Here, "emergency" already connoted a sudden or unforeseen event, making the word "sudden" in the statute unnecessary. Without a showing "that Congress intended … a dramatic change," a fair (and, likely, correct) inference is that Congress meant only to "eliminate a … redundant phrase, without intending to change the meaning of the provision." *Wimberly v. Lab. & Indus. Rels. Comm'n of Mo.*, 479 U.S. 511, 519 (1987).

The SEC points to no history showing that Congress intended the deletion to relax the emergency exception. After 1950, commentators (including in the OLC opinion on which the SEC relies) continued to insist that "the term 'emergency' means 'an unforeseen combination of circumstances.'" *Gov't Operations in the Event of a Lapse in Appropriations*, 1995 WL 17216091, at *6 (O.L.C. Aug. 16, 1995). And the SEC also fails to refute the significance of the 1990 amendments to the statute, where Congress emphasized that an emergency does not include the "ongoing, regular functions of government." 31 U.S.C. § 1342. This amendment was "intended to limit the coverage of that term [emergency], narrowing the circumstances that might otherwise be taken to constitute an emergency within the meaning of the statute," and confirms that the exception is not "overly expansive" and "is narrow." *Gov't Operations*, 1995 WL 17216091, at *1, *6. Limitations periods that the SEC knew were coming years in advance do not fit that narrow exception.

***Second***, the SEC errs when it argues that "a temporary lapse in appropriations *is* viewed as an 'unforeseen circumstance.'" (Mot. 38 (citation omitted) (emphasis in original).) The SEC's argument—that "the failure of Congress to enact appropriations at the beginning of the fiscal year may qualify as an emergency event for purposes of section 1342" (*id.* (quoting *In re Istook*, B-

285725, 2000 WL 1528747 (Sept. 29, 2000)))—would vastly expand the "emergency" exception, in contravention of the text and the statute's purpose of protecting Congress's power of the purse.

***Third***, the SEC also cannot avoid Mr. Koneru's well-pleaded allegations showing that any supposed threat to the SEC's claims caused by the specific lapse in appropriations here ***was*** foreseeable months in advance, even assuming *arguendo* some other lapse in appropriations was not and might satisfy the exception. (Compl. ¶ 47 ("The possibility of a shutdown was reported widely by July 2025, more than two months before appropriations lapsed," and "[c]overage of an increasingly likely lapse in appropriations became ubiquitous by early September").) The SEC asserts that "many potential shutdowns are averted at the last minute." (Mot. 39.) That outside-the-pleadings assertion, however, is irrelevant. Even circumstances that are "averted" still may be predictable and so not unforeseen. And regardless, Mr. Koneru's allegations show that the shutdown here was predictable enough. (Compl. ¶ 47.)

All this is more than sufficient to deny dismissal, particularly where it is Mr. Koneru, not the SEC, who should be given "the benefit of all reasonable inferences derived from the facts alleged." *Paulin*, 878 F. Supp. 2d at 245 (citation omitted).

### C. The SEC's Violation of Its Own Contingency Plan Confirms That the Filing of the SDNY Action Violated the Administrative Procedure Act.

Although the above is more than enough to hold the filing of the SDNY Action unlawful, that filing also violated the SEC's own Contingency Plan. (Compl. ¶¶ 5, 61–66.) That plan barred the SEC staff from "engag[ing] in … investigative work, including commencing investigations and conducting investigative testimony, except as necessary for the protection of property," and further provided that limited staff would continue to handle true emergency work, *e.g.*, "emergency enforcement matters, including temporary restraining orders and/or investigative steps necessary to protect public and private property." (*Id.* ¶¶ 63–64.)

Agencies "must also, of course, 'adhere to [their] own regulations.'" *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 13 (D.D.C. 2024) (citation omitted). The SEC argues that "the Contingency Plan is not a 'regulation'" (Mot. 41), but courts have extended the same principle "to internal agency guidance that are intended to create binding norms." *See* 32 Wright & Miller, Fed. Prac. & Proc. § 8172 (2d ed.) (quotations omitted); *see also Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120 (D.D.C. 2020) (violation of "internal guidance" supported APA claim). The SEC relies on *The Wilderness Society v. Norton*, 434 F.3d 584 (D.C. Cir. 2006). That case, however, considered only a set of management policies that "d[id] not emanate from a congressional mandate" and that did not "evidence an intent on the part of the agency to limit its discretion." *See* 434 F.3d at 596. The Contingency Plan here emanates from the Anti-Deficiency Act and did not purport to be optional.

The SEC also asserts that the Contingency Plan permits protection of "property," which the SEC expansively asserts includes the unproven remedies discussed above. (Mot. 40.) That interpretation strains plain meaning past its breaking point. *See* Part II.B, *supra*. And the SEC ignores Mr. Koneru's allegations that the SEC did not seek temporary restraining orders or other emergency relief (Compl. ¶ 73), which expressly are identified as "emergency enforcement matters" in the Contingency Plan. The SEC's departures from its own Contingency Plan therefore confirm that the SEC's decision to file the SDNY Action was arbitrary and unlawful.[11]

* * *

[11] Commentators also have observed that the SEC radically departed from its own prior interpretation of the Anti-Deficiency Act in filing the SDNY Action without seeking emergency relief. *See* J.R. Stark, *An Important SEC Case You're Probably Not Watching* (Jan. 26, 2026) (describing sole enforcement action filed during prior government shutdown where action involved theft of confidential information from SEC servers to enable illegal securities trading and SEC requested asset freeze on proceeds of trading), https://www.linkedin.com/pulse/important-sec-case-youre-probably-watching-john-reed-stark-ckxne/.

In the end, the plain meaning, legislative history, and agency interpretations of the Anti-Deficiency Act across decades all demonstrate that the government may act only in true "emergencies" where grave circumstances pose an "imminent" "threat" to "property" typically associated with emergent threats to the public. The SEC's potential loss of some (but not all) punitive measures for not-yet-alleged, not-yet-proven claims in a not-yet-filed litigation cannot meet any element of that definition.

## III. THE SEC'S ARGUMENTS REGARDING REQUESTED RELIEF ARE PREMATURE AND MISUNDERSTAND THE REQUEST FOR RELIEF.

The SEC briefly asserts that Mr. Koneru has no declaratory-judgment claim and that his "requested remedy is improper." (Mot. 43.) The SEC's only argument against the declaratory-judgment claim, however, is that Mr. Koneru has no underlying "cognizable cause of action." (*Id.*) Mr. Koneru has a cognizable APA claim for all the reasons discussed above, however, and so this argument fails.

The SEC's remaining attacks against Mr. Koneru's requested remedies are misguided for procedural and substantive reasons. Mr. Koneru requests several remedies, including (i) declaratory relief, (ii) an order for the SEC to dismiss the complaint and "enjoin the SEC from filing any amended complaint or otherwise continuing the SDNY Action," and (iii) "such other relief as is just and proper." (*See* Compl. at "Prayer for Relief.") The SEC focuses on the second request for relief, asserting that there is "no basis to have the Court declare the Commission's complaint null and void, preclude filing an amended complaint, and require the Commission to halt the Enforcement Action altogether." (Mot. 43.)

The SEC errs for at least two reasons.

***First***, the SEC's arguments are procedurally improper—a motion to dismiss is not a vehicle for challenging a requested ***remedy***, as opposed to a legal claim. "The particular form of relief



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

requested does not determine whether a plaintiff has stated a claim upon which relief can be granted … Whether Plaintiffs have requested the appropriate relief is not relevant at this stage of the proceedings." *Motamed v. Chubb Corp.*, 2016 WL 1162853, at *5 (D.N.J. Mar. 24, 2016); *see also Steinberg v. Gray*, 815 F. Supp. 2d 293, 303 n.9 (D.D.C. 2011) ("'[I]njunctive relief is not a claim but a remedy,' making a motion to dismiss under Rule 12(b)(6) … an inappropriate method of challenge.").

***Second***, the SEC misunderstands Mr. Koneru's request for relief. Mr. Koneru does not ask that the Court forever bar the SEC from any enforcement action. Mr. Koneru's request instead is targeted only at the SDNY Action, which was born from the SEC's blatant Anti-Deficiency Act violation.[12] Mr. Koneru's requested relief will be appropriate given that the SEC filed the SDNY Action without legal authority. The SEC's attempt to distinguish *Aponte v. Liggett Group*, 2014 WL 1087977 (S.D.N.Y. March 18, 2014) fails—just as in that case, the SEC here also had no "legal authority" to file the SDNY Action at the time it did (Mot. 43). The Anti-Deficiency Act precluded the filing.

The SEC's assertion that the Anti-Deficiency Act "does not restrain the Commission" (Mot. 43) is extraordinary. The Commission can act only through its employees. It cannot be that the Commission can violate the statute without consequence, so long as its fellow executive agency (the Department of Justice) declines to seek charges or penalties. That assertion would clear the way for lawless Executive Branch activity during a lapse in appropriations (exactly what happened here). *See* Part I.D, *supra*. There also is no authority for the theory that the Anti-Deficiency Act does not apply to the Commission. *Carlson v. Department of Energy*, 2019 WL 3997383, at *2

[12] Theoretically, the SEC could dismiss the SDNY Action and refile an entirely new suit—understanding, of course, that the new lawsuit would trigger a different filing date for limitations purposes. Due process also should require proper Wells process before any new lawsuit were filed.

(D.N.M. Aug. 23, 2019), is not such a case—that opinion simply declined to strike a reply brief filed after an employee was recalled from furlough status, without addressing whether the Anti-Deficiency Act was violated. *Id.*

The SEC's citation to *Buntrock* is (again) equally unpersuasive. That case considered assertions that an investigation was not impartial—*Buntrock* said nothing about an agency being immune from the Anti-Deficiency Act. 347 F.3d at 996. *Buntrock* did not consider the Anti-Deficiency Act at all. *Id.* *Buntrock* did not address whether an agency could force a party to litigate through a proceeding the agency lacked authority to bring from the start. (As discussed above, the answer to that question is no. *See* Part I.E, *supra*). And, moreover, *Buntrock*'s concern that "the public" could be "deprived of a remedy against an adjudicated wrongdoer" (Mot. 43 (quoting 347 F.3d at 998)) could not be more inapt. Mr. Koneru has not been "adjudicated" to have done wrongdoing; investors already were redressed via a settlement that a court found was "fair, reasonable, and adequate" (Compl. ¶¶ 13–14, 59), and the public would not be deprived of "any" remedy if the SEC were held to the law (there is no dispute that other claims requiring proof of scienter still may be timely).

The Court should reject the SEC's remedies-related arguments both because they are premature and because they are wrong. Mr. Koneru's "here-and-now injur[ies] from being subjected to an illegitimate proceeding" justify the suit he has brought here. *Axon Enter., Inc.*, 598 U.S. at 191.

## CONCLUSION

For the foregoing reasons, Mr. Koneru respectfully requests that the Court DENY the SEC's Motion To Dismiss in its entirety.

.



PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, DC 20036
1(202) 551-1700

DATED: March 17, 2026

PAUL HASTINGS LLP

By: /s/ *Ronald K. Anguas, Jr.*

Bradley J. Bondi
Ronald K. Anguas, Jr.
Igor Timofeyev
Neil J. Schumacher
Nicholas J. Griepsma
Joseph C. Schroeder (*application forthcoming*)
2050 M Street, NW
Washington, DC 20036
Phone: (202) 551-1700
Facsimile: (202) 551-0201
bradbondi@paulhastings.com
ronaldanguas@paulhastings.com
igortimofeyev@paulhastings.com
neilschumacher@paulhastings.com
nicholasgriepsma@paulhastings.com
josephschroeder@paulhastings.com

***Attorneys for Plaintiff Srinivas Koneru***